## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

DESERAE TURNER, et al.,

        Plaintiffs,

v.

FLOYD COUNTY SCHOOL
DISTRICT,

        Defendant.

CIVIL ACTION FILE NO.

4:22-cv-00113-LMM

## DEFENDANT FLOYD COUNTY SCHOOL DISTRICT'S
## <u>BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

## I.      INTRODUCTION

Plaintiffs assert claims under 42 U.S.C. §1983, the Fourteenth Amendment the Equal Protection Clause, and Title VI as follows:

**Count I:** Denial of Equal Protection in violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983; **Count II:** Infringement on Free Speech (by Dress Code and other Disciplinary Policies) in violation of the First Amendment to the U.S. Constitution and 42 U.S.C. § 1983; **Count III:** Infringement on Free Speech (for Punishment for Planned Protest) in violation of the First Amendment to the U.S. Constitution and 42 U.S.C. § 1983; **Count IV:** Race

Discrimination in violation of Title VI, 42 U.S.C. § 2000d; and **Count V:** Retaliation in violation of Title VI, 42 U.S.C. § 2000d. (Doc. 24.)

## II.    BACKGROUND AND STATEMENT OF FACTS

Coosa High School ("CHS") is in the Floyd County School District ("FCSD"). (Cox Dep. P. 4, L.12-13) Dr. Glenn White has been the Superintendent of the FCSD since August 2020. (White Dep. P. 17, L.5-10.) Previously he served as the Director of Student Services. (White Dep. P. 19, L.5-20.)  LaDonna Turrentine was the Principal at CHS from 2017 until Judson Cox became Principal in Fall 2021. (Turr. Dep. P. 17, L.19-25; Cox Dep. P. 19, L.7-13.) Kristen Martin became an Assistant Principal at CHS in the Fall of 2021. (Martin Dec. ¶ 3)

Jessica Murray is the mother of Plaintiffs J.T.M. and J.R.M. (J. Murray Dep. P.9, L.16-24.) LaKeisha Turner is the mother of Plaintiffs Deserae Turner, M.T., and B.T. (L. Turner Dep.P.9, L.6 – P. 10, L.6.)

CHS was shut down from March to August 2020 due to COVID. (White Dep., P.49, L.8-10.) In June 2020, Turrentine and White were made aware of a social media video post showing a CHS student, B.M., kneeling on the neck of another CHS student in a supposed George Floyd re-enactment. (Turr. Dep. P. 80, L.7 – P. 81, L.11; White Dep. P. 59, L.6 – P. 61, L.1.) The video in the social media post was not taken or created on CHS property. (White Dep. P. 60, L.20 – P. 61, L.12.)

White consulted with FCSD's legal counsel regarding disciplining B.M. (White Dep. P. 60, L.20 – P. 61, L.12; P. 65, L.9-17.) Because the social media post occurred during the summer when school was not in session, there were no grounds to believe the social media post was a disruption to the operation of CHS. (White Dep. P. 96, L.23 – P. 97, L.13.) CHS could not legally discipline B.M., however, Turrentine sent a letter to B.M.'s mother cautioning her about B.M.'s behavior. (White Dep. P. 65, L.12-17; Ex. 1.)

In September 2020, J.R.M. became a student at CHS. (J.R.M. Dep. P. 18, L.7-11.) She attended CHS online as a remote student and did not physically attend CHS until after the Fall break in 2020. (J.R.M. Dep. P. 19, L.3-10.) Despite J.R.M. not physically attending CHS, and not interacting with CHS teachers or students, on September 18, 2020, J.R.M. sent an email to CHS Assistant Principal Miriam McGhee in which she accused CHS of being racist:

> "Coosa is EXTREMELY racist, you allow students to have confederate flags as their profile picture and allow them to have trump merch… How smart of you to encourage racism by having racists work there and allow your students to wear and bring racist merchandise… [Y]our school dress code has mysogynistic (sic) written all over it." (Ex. 2.)

The CHS dress code is content neutral and is attached at Exhibit 3.

In March 2021, Turrentine was made aware of a social media video post by B.M. that had been created in the CHS media center and in which B.M. made various statements that were racist and used the "N" word. (Turr. Dep. P. 44, L.10-16;  P.

47, L.17-25.) Turrentine and the School Resource Officer met with B.M. and his parents the next morning, March 4. (Turr. Dep. P. 56, L.17 – P. 57, L.6.) After the meeting, B.M. received an out of school suspension. (White Dep., P. 80, L.5 – 24.) B.M. did not continue to attend class. (White Dep. P.80, L.10-14.)

In late August 2021, a social media post on the social media account of a CHS student depicted an African American child in a bucket with the words, "N____ for sale", was brought to the attention of Assistant Principal Kristen Martin.  Martin investigated and determined that the post was created by the student when the student was 11 years old and in middle school.  The student was not disciplined as there is no basis to discipline a student for actions or behavior before the student attended CHS. (Martin Dec. ¶ 5.)

The week of October 4, 2021, was Spirit Week at CHS. Each day of the week had a different theme allowing students to dress in accordance with the theme of the day. (Cox Dep. P.113, L.14 – P.114, L.3.) On Tuesday, October 5, 2021, it was reported to CHS Principal Cox that two (2) students were carrying or waving a Confederate flag on campus at CHS. After investigation, the two (2) students that carried the flag, a White female, and a Hispanic female, received OSS because their actions were considered disruptive to the operation of CHS. (Martin Dec. ¶ 7, 8.) J.T.M. did not see students wearing Confederate flag clothing, other than one boy that wore a Confederate flag belt buckle. (J.T.M. Dep. P. 71, L.8-13.)

During Spirit Week it was also reported that a student was carrying a noose around campus. (Martin Dec. ¶ 9.) Upon investigation by Kristen Martin, which included speaking to the student and observing the alleged "noose", it was determined that the "noose" was a lasso, which the student had because he was dressed as a cowboy for Spirit Week. (Martin Dec. ¶ 10.)

During Spirit Week, J.R.M. and other CHS students planned a protest at CHS to oppose what they viewed as discriminatory behavior at CHS. (J.R.M. Dep. P. 62, L.22 – P.63, L.20.) To advertise this protest, the group published social media posts, and distributed 200 flyers in CHS. (M.T. Dep. P. 106, L.3-10; P. 108, L.5-L.10; J.R.M. Dep. P. 55, L.3-6; P. 71, L.8-9, 17-15.)  The protest was to occur on the main stairs at CHS between classes. (D. Turner Dep. P. 102, L.5-10.) An advertisement for the protest stated it was to take place from 9:45 a.m. – 3:15 p.m. in front of the main gym. (Ex. 4.)

On Thursday, October 7, 2021, Principal Cox made an announcement stating that a protest would not be allowed at CHS and those in possession of flyers related to the protest should bring them to the office immediately. (Cox Dep. P. 129, L.21 – P. 130, L.23.)  Later that day, approximately 10-15 students arranged through a social media group chat to all leave their classrooms at the same time and go to the administrative offices in the CHS lobby. (J.R.M. Dep. P. 79, L.13 – P. 81, L.3.)

Once in the lobby, these students were loud, cussing, and created a disturbance. (Martin Dec., ¶ 14; Cox Dep. P. 143, L.21-24.) The students were told that if they wanted to speak with Principal Cox about their concerns, they should write their names on a pad being provided, and Principal Cox would call them to his office one at a time to speak to him. (Cox Dep., P. 142, L.23–P.143, L.3.) The students were instructed to return to class after writing their names on the pad. *Id.* Some students returned to class. (Martin Dec. ¶ 16, 17.) Other students did not return to class and continued to cuss and holler. (Cox Dep. P.143, L.21-24.) The students that refused to return to class were suspended for the disturbance and refusing to follow a reasonable request. (Cox Dep., P. 142, L.4-7.) The students that returned to class when instructed to do so, were not suspended. (Martin Dec. ¶ 19.) The suspended students were Plaintiffs J.R.M., M.T., B.T., Deserae Turner, and two (2) other Black females. (Martin Dec. ¶ 19.)

Plaintiff Jessica Murray ("Murray") also came to the school lobby during this incident and refused to leave when asked. Ms. Murray's actions and behavior contributed to the disturbance at CHS. (Martin Dec. ¶ 18.) It was determined that Murray would be given a trespass notice because of her actions and behavior that morning in the CHS lobby. (Cox Dep. P. 170, L.16 – P. 172, L.12.); (Ex. 5.)

On October 8, some Plaintiffs and other students held a protest across the street from CHS property. (Martin Dec. ¶ 20.) Several of those attending the protest

first went to school in the morning, and then left school without following the mandatory checkout procedure. (Martin Dec. ¶ 21.) As a result of leaving CHS without following the mandatory checkout procedure, the following students were suspended: K.T. (W/F), L.H. (W/F), A.R. (W/F), V.L. (H/F). B.A. (W/M), and A.R. (W/F). (Martin Dec. ¶ 22.) J.T.M. attended the protest; however, she was not suspended because she was not part of the disturbance in the school lobby on October 7, and did not violate the mandatory checkout procedure on October 8. (Martin Dec. ¶ 23.) Plaintiff Deserae Turner did not attend the protest on October 8. (D. Turner Dep. P. 131, L. 16-25.) However, she was suspended for contributing to the disturbance in the lobby on October 7. (Martin Dec. ¶ 19.)

As a result of the publicized protest at CHS, CHS and the Floyd County Board of Education received numerous calls and e-mails from parents concerned about the safety of their children who were students at CHS. (White Dep. P. 160, L.13-19.) As a result of the planned protest, 242 students were absent on Thursday, October 7, 2021, and 620 students (approximately 75% of the student population) were absent on Friday, October 8, 2021. (Martin Dec. ¶ 24.) The high rate of absenteeism caused a major disruption to the operation of the school. (Martin Dec. ¶ 25.)

### III.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Summary Judgment Standard.

"Summary judgment is proper 'if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). "A moving party discharges its burden on a motion for summary judgment by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving party's case." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Id.* at 593-94 (cits. omitted).

"The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient" to defeat a motion for summary judgment. *Moultrie v. Georgia Department of Corrections*, 703 F. App'x 900, 903 (11th Cir. 2017) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (internal punctuation omitted)).

**B.     Plaintiffs' § 1983 claims (Counts I, II, and III) fail as a matter of law because Plaintiffs have failed to present evidence showing a pervasive and well-settled custom to make the School District liable under *Monell*.**

School boards may not be held liable for constitutional deprivations on the theory of *respondeat superior*. *Denno v. Sch. Bd. of Volusia Cty., Fla.*, 218 F.3d 1267, 1276 (11th Cir. 2000) (citing *Monell v. Dept. of Social Services,* 436 U.S. 658,

694 (1978)). "Instead, 'municipal liability is limited to action for which the municipality is actually responsible.'" *Hill v. Cundiff*, 797 F.3d 948, 977 (11th Cir. 2015) (citing *Denno*, 218 F.3d at 1276) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986)). Liability may only be based on "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law.'" *Id*. (quoting *Denno*, 218 F.3d at 1276). In other words, "[a] municipal entity, such as [a] School Board, cannot be held liable under § 1983 'simply because its agent causes an injury, even a constitutional injury.'" *Van Etten v. Sch. Bd. of Okaloosa Cty., Fla.*, 614 F. Supp. 3d 1112, 1122 (N.D. Fla. 2022) (quoting *Gilmere v. City of Atlanta, Ga.*, 737 F.2d 894, 902 (11th Cir. 1984)).

To establish liability against a school board, plaintiffs must show "persistent and widespread ... practices" or "deeply embedded traditional ways of carrying out ... policy" that, although unwritten, are "so permanent and well settled as to [have] ... the force of law." *Van Etten*, 614 F. Supp. 3d at 1122-23 (quoting *Monell*, 436 U.S. at 691 & n. 56). Plaintiffs must also show that the school board had "actual or constructive knowledge of the widespread unconstitutional practice to form a custom of indifference." *Id.* at 1123 (quoting *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986)). "'[R]andom acts or isolated incidents are insufficient.'" *Id. See also Arrington v. Miami Dade Cty. Public Sch. Dist.*, 835 F.

App'x 418, 422 (11th Cir. 2020) ("[V]arious and seemingly unconnected instances of harassment were not 'sufficiently widespread so as to put the defendant on notice of the need to act'" precluding liability against a school district under § 1983). *See, e.g.*, *Denno*, 218 F.3d at 1277-78. It is especially difficult, if not impossible, to show a pervasive and well-settled custom sufficient to impose liability on a school district where there is no evidence of constitutional deprivations at any other school within the district. See *Denno*, 218 F.3d at 1278 (pointing to lack of evidence of similar incidents at other schools within the school district to support the conclusion that the plaintiff had failed to adduce evidence to create a genuine issue of fact as to a pervasive and well-settled custom).

Further, "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Id.* (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997)). "The plaintiff 'must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.'" *Id.* (quoting *Brown*, 520 U.S. at 404). "The Supreme Court has noted the 'deliberate indifference' standard under § 1983 is a 'stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Id.* (quoting *Brown* at 410).

In *Adams v. Demopolis City Schools*, 80 F.4th 1259, 1263-64 (11th Cir. 2023), the plaintiff was the mother of a nine-year-old black girl, McKenzie, who took her own life after being bullied at school because of her sex and her race. McKenzie was bullied repeatedly over a period of months, including being called "N*****", "black bitch," "dumb black bitch," "pussy ass bitch," and being told to "go kill yourself." *Adams*, 80 F.4th at 1263. The bullying continued even after it was reported to school officials, including a teacher and the Assistant Principal. *Id.* at 1265.

The Eleventh Circuit affirmed summary judgment for the school system on plaintiff's equal protection claim. *Id.* at 1274. The Court stated, "the record d[id] not support that the defendants acted even with deliberate indifference" and "no reasonable jury could conclude the defendants' actions amounted to intentional discrimination—which, in this context, would mean a pervasive practice or custom of ignoring the bullying directed at McKenzie." *Id*. The Court also noted that there was no evidence of a widespread problem throughout the school system. *Id*.

In the present case, Plaintiffs have failed to present evidence of any widespread custom or practice that would subject the School District to liability under *Monnell*. Instead, the evidence shows that each isolated incident of which any school official had knowledge was addressed promptly. For this reason alone, summary judgment is proper on all of Plaintiffs § 1983 claims (Counts I-III).

**C.     Count I: Plaintiffs have not presented evidence to support their Equal Protection claim.**

"The Equal Protection Clause is 'essentially a direction that all persons similarly situated should be treated alike,' … and 'simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike, …" *Adams by & through Kasper v. Sch. Bd. Of St. Johns Cnty.*, 57 F.4th 791, 800-01 (11th Cir. 2022) (citations omitted). Further, "[t]o establish an equal protection clause violation, a plaintiff must demonstrate that a challenged action was motivated by an intent to discriminate." *Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993) (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

### i.  Alleged indifference to racist remarks.

Plaintiffs claim the School District violated their equal protection rights through a "widespread custom of deliberate indifference to evidence of racist remarks and actions by white students and white teachers against them" (Am. Compl. [Doc. 24] ¶ 84.) However, Plaintiffs have failed to present evidence of deliberate indifference by the School District to race-based remarks and behavior. The undisputed evidence is that the isolated incidents of which any school official had knowledge were addressed promptly and appropriately.

For example, when Glenn White was advised of B.M.'s George Floyd re-enactment social media post, B.M. was not disciplined only because White was

advised such discipline would violate B.M.'s right of free speech.  Nevertheless, a written warning was issued to B.M.  Several months later, when Turrentine learned that B.M. posted to social media a video with racist content that was recorded in the CHS media center, B.M. was suspended and did not attend class at CHS again.

When Assistant Principal Martin was advised of racist or discriminatory conduct, she promptly investigated and took action when appropriate.   She suspended two girls, one white and one Hispanic, for creating a disturbance by carrying a Confederate flag on campus. When told about a social media post with the words, "N_____ for sale", she determined the post was made by a student when she was in middle school.  Martin investigated an allegation that a student was carrying a noose, only to determine the "noose" was a lasso as part of Spirit Week. When a student wore a belt buckle of a silver confederate flag, she admonished the student and instructed him not to wear the belt buckle to school.

Uncorroborated testimony by some Plaintiffs' alleging that students used the "N" word in the hallways of CHS, and that students wore clothing showing the Confederate symbols with impunity is not sufficient to create a genuine issue of fact. There is no evidence that any school official was aware of these alleged incidents. Further, Plaintiff J.T.M. testified she never witnessed students yelling the "N" word in the hallways.  She never saw students wearing clothing with Confederate symbols other than the one (1) time a student wore a Confederate flag belt buckle, which CHS

addressed promptly. Plaintiffs have not presented any evidence whatsoever of deliberate indifference to racist remarks.

### ii. Alleged inconsistent application of disciplinary policies.

Plaintiffs can meet their burden on summary judgment by showing they were treated less favorably than a similarly situated comparator. *See Arrington*, 835 F. App'x at 422. A meaningful comparator must be "similarly situated in all material respects." *Id*. at n. 2; *see also Lewis* 918 F.3d at 1218. This is because "[b]y its very nature,… discrimination is a comparative concept—it requires an assessment of whether 'like' people or things are being treated 'differently.'" *Id*. at 1223.

"Ordinarily,…a similarly situated comparator will have engaged in the same basic conduct (or misconduct) as the plaintiff, will have been subject to the same…policy, guideline, or rule as the plaintiff, …have been under the jurisdiction of the same supervisor as the plaintiff…, and will share the plaintiff's…disciplinary history." *Lewis*, 918 F.3d at 1227–28 (internal citations omitted); *see also Sumrall v. Ga. Dep't of Corr*., 5:21-CV-187 (MTT), 2023 WL 2072085, at *5 (M.D. Ga. Feb. 17, 2023) ("To support an equal protection claim [in the prison context], a prisoner must be 'similarly situated in all material respects'" and "will have engaged in the same basic conduct as the plaintiff.") (internal citations omitted).

In *Carr v. Bd. of Regents of Univ. Sys. of Ga*., 249 F. App'x 146 (11th Cir. 2007), for example, an African American student asserted claims for race

discrimination under Title VI and the Equal Protection Clause after she was suspended for stealing textbooks. *Carr*, 249 F. App'x at 147. She presented evidence that five white students accused of the same conduct—theft—received lesser sanctions than she did. *Id*. at 149. The district court granted summary judgment. The plaintiff "failed to present a genuine issue of material fact that the Board treated similarly situated students of different races differently,…[t]he district court's grant of summary judgment for the Board was appropriate." *Id.* at 150. *See also Arrington, 835 F.* App'x at *421*, (insufficient information that any treatment plaintiff experienced "was due to his race rather than some other factor.") (citation omitted).

Here, Plaintiffs baldly allege CHS had a "custom of inconsistently applying Coosa High's disciplinary policies to the detriment of Black students" (Am. Compl. [Doc. 24] ¶ 84], but the undisputed evidence is that the students who were suspended engaged in different behavior than the students who were not. For example, the students who returned to their classrooms after being instructed to do so were not suspended, while the students who continued to create a disturbance and refused to return to their classrooms were. Similarly, students who attended the protest after leaving the school without permission, in violation of school policy, were suspended, while students who attended the protest without having come to school in the first place were not. Of the six students suspended on October 8, five were White and one

was Hispanic. None were Black. [1]  Plaintiffs have failed to present any evidence that they were treated differently because of their race, and summary judgment for the School District is due to be granted.

**D.     Count II: Plaintiffs have failed to present evidence of infringement on their freedom of speech.**

"[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Id*. at 405-406 (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)). In school, students' First Amendment rights are circumscribed in light of the special characteristics of the school environment." *Id*. at 406 (citation omitted).

In *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008), high school students sued the school board for banning clothing with the Confederate flag. The students claimed that the ban violated their right to free speech. The school's dress code prohibited anything that would cause a disruption to the school environment, and the principal specifically mentioned Confederate flags as being prohibited during a school assembly. *Barr*, 538 F.3d at 557. The principal did not mention a ban on any other

---

[1] *See, e.g., Dejarnett v. Willis*, 976 F. Supp. 2d 1271, 1285 (M.D. Ala. 2013) (quoting *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (In the employment context, "[w]hen a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'").

potentially racially divisive symbols. Despite this—and despite several students' uncorroborated testimony that they saw other students wearing clothing with other arguably racially-divisive symbols—the Sixth Circuit held that the students produced no more than "a scintilla of evidence" that the school enforced the dress code in a viewpoint-discriminatory manner summary judgment was affirmed. *Id.*

### i.  Dress Code

The CHS dress code is facially neutral and only prohibits clothing, hair styles, accessories, and make-up that are "a distraction to the learning process, immodest, inflammatory or offensive, or pose a safety hazard." There is insufficient evidence that the dress code was enforced in a viewpoint discriminatory manner.

Only J.R.M. and M.T. claim they were not allowed to wear clothing with George Floyd or BLM images or messages.  The other three student Plaintiffs testified that this never happened to them.  Even taking Plaintiffs' uncorroborated testimony as true for summary judgment purposes, the isolated instances in which Plaintiffs claim they were told to turn their clothing inside-out or change their clothing would not be sufficient to create a widespread, pervasive custom or practice that would subject the School District to *Monell* liability.

### ii.  Social Media Policy

Plaintiffs also allege, without any supporting evidence, that "Coosa High's enforcement of its social media policy…discriminates based on viewpoint…" (Am.

Compl. [Doc. 24] ¶ 87.) However, there is no evidence that the School District curtailed Plaintiffs' speech on social media.

**E.      Count III: The School District did not infringe on Plaintiffs' free speech related to a planned protest.**

"[S]chools have a special interest in regulating speech that 'materially disrupts classwork…'" *Mahanoy Area Sch. Dist.,* 141 S.Ct. at 2045 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 413 (1969). Plaintiffs allege that they were disciplined for "planning a peaceful protest that would not have disrupted the school day" in violation of their free speech rights. (Am. Compl. [Doc. 24] ¶ 89.) There is no evidence that any student was disciplined for planning or attending the protest. Instead, students were disciplined for causing a disruption and refusing to return to class when instructed to do so on October 7 and for leaving the school without following the mandatory check-out procedure on October 8. For example, J.T.M. attended the protest on October 8, but she was not suspended because she did not contribute to the disturbance in the CHS lobby or refuse to return to her class on the morning of October 7.  In contrast, Deserae Turner did not attend the protest, but she was suspended because she contributed to the disturbance in the lobby and refused to return to her class.  This shows that suspensions were based on conduct in the lobby, not planning or attending the protest.

In addition to the discipline being based on the disruption and refusal to follow simple instructions the day before the protest, the protest as planned did, in fact,

disrupt the school day. According to Deserae Turner, and the protest posts and flyers, the protest was to occur within the CHS building. Approximately 75% of the student population did not attend school on October 8 due to the planned protest. Students who desire an education and deserve an education were denied that opportunity solely due to Plaintiffs' planned protest. Finally, even if Plaintiffs' free speech had been curtailed, this isolated instance is not a pervasive custom or practice that would subject the School District to *Monell* liability.

Plaintiffs have failed to present evidence that the School District infringed their right to free speech, and summary judgment is proper for the School District.

**F.      Count IV: Plaintiffs' Title VI claim for student-on-student racial harassment fails because Plaintiffs have failed to show that the school district was deliberately indifferent to known severe, pervasive, and objectively offensive harassment over which the School District had control.**

Under Title VI a recipient of federal funding "is liable for student-on-student harassment if it is 'deliberately indifferent to [] harassment, of which [it] has actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Hill,* 797 F.3d at 968 (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650-53 (1999)).[2] The standard for holding a school district liable for

---

[2] *Hill* and *Davis* involved student-on-student sexual harassment under Title IX instead of student-on-student racial harassment under Title VI at issue here. However, courts have consistently held that the standard for liability for peer harassment is the same under both Title IX and Title VI. *See Franklin v. Gwinnett*

peer harassment is rigorous. *See Davis*, 526 U.S. at 650-53; *Hill*, 797 F.3d at 968.

Plaintiffs asserting such a claim must satisfy seven elements:

> (1) the defendant must be a recipient of federal education funding; (2) an "appropriate person," meaning an official of the funding recipient who, "at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf," … must have had (3) actual knowledge of the sexual harassment and discrimination the plaintiff suffered; (4) the sexual harassment must have been "sufficiently 'severe, pervasive, and objectively offensive'"…; (5) the funding recipient must have been deliberately indifferent to the sexual harassment and discrimination the plaintiff endured; (6) the funding recipient's actions must have caused the plaintiff to undergo sexual harassment or made the plaintiff more vulnerable to it or its effects; and (7) the funding recipient's deliberate indifference to the harassment and discrimination must have effectively barred the plaintiff's access to an educational opportunity or benefit.

*Stinson*, 824 F. App'x at 856-57 (internal citations and punctuation omitted).

Here, Plaintiffs allege the school district violated Title VI by "failing to address incidents of racism by white students…" (Am. Compl. [Doc. 24] ¶ 91.) As to the first element, the School District does not dispute that it is a Title VI funding recipient. Defendant also acknowledges that a school principal and assistant principal, e.g., Principal Cox, former Principal Turrentine, Assistant Principal McGhee, and Assistant Principal Martin, likely satisfy the second element, as

---

*Cty. Pub. Sch*., 911 F.2d 617, 619 (11th Cir. 1990) ("Hereinafter we discuss Title VI and Title IX cases somewhat interchangeably, because we believe it is settled that analysis of the two statutes is substantially the same.").

appropriate persons "high enough up the chain-of-command that his acts constitute an official decision by the school district itself not to remedy the misconduct." *Id.* (quoting Floyd v. Waiters, 171 F.3d 1264, 1264 (11th Cir.1999)). *See Stinson* 824 F. App'x at 857.

Regarding the third element, because actual knowledge of the *Board* is what matters for evaluating student-on-student harassment claims, Courts should only analyze harassment of which an appropriate person had actual knowledge. *Id.* at 971. Plaintiffs have the burden of proving that the student-on-student harassment *of which the Board had actual knowledge* was so severe, pervasive, and objectively offensive that it denied them equal access to education. *See Hill*, 797 F.3d at 972. Further, the harassment *of which the Board had actual knowledge* must be serious enough to have a "systemic effect" of denying equal access to education. *Id.* (citing Davis, 526 U.S. at 652). In the employment context,[3] evidence of sporadic and isolated use of Confederate flags does not support hostile work environment claim. *See Barrow v. Georgia Pacific Corp.*, 144 F. App'x 54, 58 (11th Cir. 2005). In *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240 (11th Cir. 2014), for example, exposure to the Confederate flag every day, exposure to racist graffiti in the restroom, hearing people

---

[3] Courts look to Title VII hostile work environment claims to evaluate Title VI hostile educational environment claims. *See, e.g., Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 584 n.2 (5th Cir. 2020) ("Titles VI and IX rely on Title VII hostile environment caselaw."); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) (applying Title VII caselaw to Title VI hostile environment claim).

use the word "nigger," hearing people refer to black people as "monkeys," and hearing about a noose in the breakroom did not create an objectively hostile workplace. *Adams*, 754 F.3d at 1254-58.

Claims for peer harassment are even more difficult to prove in the school context as compared to the adult work context. The Supreme Court cautioned, "[c]ourts…must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Davis*, 526 U.S. at 651. This is because "in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and … conduct that is upsetting to the students subjected to it." *Id*. at 651-52. But "[d]amages are not available for simple acts of teasing and name-calling…" *Id*.

Finally, when evaluating a hostile environment claim, the court should not consider racial slurs about which plaintiffs were not aware, and the court should evaluate each plaintiff separately based on her experience to determine whether each *personally* experienced an objectively hostile environment. *See Adams*, 754 F.3d at 1251-58. Isolated incidents that do not involve a plaintiff directly and harassment of others that a plaintiff learns about from other people do not create an objectively hostile environment. *Id*. at 1256.

Here, no Plaintiff has presented evidence that she experienced severe, pervasive harassment directed at her. For example, J.T.M. testified she only saw one

student wear Confederate flag clothing (a belt buckle), and never heard students yelling the "N" word in the hallways.

As to the fifth element, deliberate indifference, "[f]unding recipients are deliberately indifferent 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Hill*, 797 F.3d at 973 (quoting *Davis*, 526 U.S. at 648). Courts can find that a response is not clearly unreasonable as a matter of law. *Davis*, 526 U.S. at 649). "The deliberate indifference standard is rigorous and hard to meet." *Hill*, 797 F.3d at 975. Further, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648.

Here, there is no evidence that the School District's response to known acts of harassment was clearly unreasonable in light of the known circumstances. Instead, the undisputed evidence is that each alleged instance of harassment reported to school officials was investigated and dealt with accordingly.

For the sixth element, Plaintiffs asserting a Title VI student-on-student harassment claim must present evidence showing that the Board's actions caused the harassment or made the plaintiff more vulnerable to it or its effects. *See Stinson*, 824 F. App'x at 856-57. Here, White, Turrentine, Cox, and Martin all took action to curb any harassment of which they were aware. Plaintiffs have failed to meet their burden

of coming forward with evidence that the School District caused the student-on-student harassment or made any of the plaintiffs more vulnerable to it.

As to the seventh element, Title VI plaintiffs have the burden of showing that the school's deliberate indifference to known severe, pervasive harassment effectively barred the plaintiff's access to an educational opportunity or benefit. *Stinson*, 824 F. App'x at 857. For example, a student's decision to unenroll and move to another school district because of a school district's clearly unreasonable response is evidence that the student was effectively barred from access to an educational opportunity. *Id.* at 860 (citing *Hill*, 797 F. 3d at 975). However, a mere decline in grades is not enough. *See Davis*, 526 U.S. at 652. Here, there is no evidence that any of the Plaintiffs unenrolled from CHS because of harassment or was otherwise barred from access to any educational opportunity or benefit.

### G.   Count V:   Plaintiffs have not presented sufficient evidence of retaliation under Title VI.

To show a *prima facie* case of retaliation under Title VI, a plaintiff must show (1) that she engaged in statutorily protected activity; (2) that CHS took adverse action against her; and (3) that there is a causal link between the two. *Ellis v. Morehouse Sch. of Medicine*, 925 F. Supp. 1529, 1549 (11th Cir. 1996). Even if Plaintiff shows a prima facie case, CHS may proffer a legitimate, non-discriminatory reason for the adverse action, at which point, Plaintiff must show that CHS's proffered reason is mere pretext. *Id.*

Defendant has previously addressed in this Brief that the suspensions of J.R.M. and J.T.M. were based on their actions on October 7 and were not discriminatory. The trespass warning issued to Jessica Murray was a result of her actions in the CHS lobby the morning of October 7. CHS administration had to deal with an unruly and disruptive group of students in the lobby. Murray added to the problem by refusing to leave the lobby when requested to do so. Rather than allowing school administration to use their efforts to return to a normal school day, Murray's actions required school administration to continue to spend their time dealing with her. There is not a causal link between any prior complaints by Murray and the trespass letter and Murray's actions in the CHS lobby were a legitimate, non-discriminatory reason to issue the trespass letter. The issuance of the trespass letter was not retaliatory, and Murray has failed to make a prima facie case of retaliation.

## IV.   CONCLUSION

Based on the foregoing reasons, Defendant respectfully requests that its Motion for Summary Judgment be granted and that all Plaintiffs' claims be dismissed.

Respectfully submitted this 6th day of December, 2023.

**HALL BOOTH SMITH, P.C.**
*/s/ Richard N. Sheinis*
RICHARD N. SHEINIS
GA State Bar No. 639865
11215 North Community House Rd., Suite 750
Charlotte, NC  28277
T:  980-859-0380
E:  rsheinis@hallboothsmith.com
***Attorneys for Defendant***