## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | |
|---|---|
| DESERAE TURNER, individually; M.T. and B.T., both minors, by and through their mother, LEKISHA TURNER; and J.T.M. and J.R.M., both minors, by and through their mother, JESSICA MURRAY; and JESSICA MURRAY, individually, <br><br> Plaintiffs, <br><br> v. <br><br> FLOYD COUNTY SCHOOL DISTRICT, <br><br> Defendant. | CIVIL ACTION <br><br> Case No. 4:22-cv-00113-LMM |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Come now Plaintiffs **Deserae Turner; M.T. and B.T.**, by and through their mother **Lekisha Turner**; **J.T.M and J.R.M**., by and through their mother **Jessica Murray**, and file the following Memorandum of Law in Opposition to the Motion for Summary Judgment by Defendant **Floyd County School District** (Doc. 48). Plaintiffs rely on the following citations and legal authority:

## INTRODUCTION

The hope that racism would fade from one generation to the next is one of America's lost promises. The Plaintiffs, Desarae Turner, M.T., B.T., J.T.M., and J.R.M., are all young African American women who can attest that bigotry is alive in their generation, based on the persistent and virulent racial harassment they were subjected to by their classmates at Coosa High School ("Coosa High"), a school operated by Defendant Floyd County School District ("FCSD"). Based on FCSD's failure to remedy their mistreatment, Plaintiffs have brought statutory and constitutional claims under Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the U.S. Constitution. Several of the Plaintiffs also assert First Amendment claims that they were suspended for their role in planning a peaceful protest and that Coosa High's student speech policies censored certain viewpoints, like solidarity for the Black Lives Matter movement, while condoning pro Confederate nostalgia.

FCSD contests Plaintiffs' version of events and claims that the evidence does not establish valid legal claims. But virtually every salient fact in this case is in dispute, including the severity and frequency of racial harassment at Coosa High, how the school responded to complaints of bullying, and the rationale for suspending four Plaintiffs a day before an anti-racism protest. The resolution of

those disputes is a task for a jury, and for the foregoing reasons, FCSD's motion for summary judgment should be denied.

## I.    LEGAL ARGUMENT AND CITATIONS OF AUTHORITY[1]

### A.  Plaintiffs' Equal Protection Clause and Title VI claims

Title VI of the Civil Rights Act ("Title VI) prohibits racial discrimination "under any program or activity receiving [f]ederal financial assistance." 42 U.S.C.A. § 2000d. In terms of the scope of liability, Title VI claims are coextensive with race-based claims under the Equal Protection Clause of the Fourteenth Amendment, *see Elston v. Talladega County Board of Education,* 997 F.2d 1334, 1405 n. 11 (11th Cir. 1993), which prohibits any entity existing under state law from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. But in contrast with Title VI, a school district is not subject to vicarious liability for constitutional claims, which must be pleaded under 42 U.S.C. § 1983. *See Jett v. Dallas Independent School District*, 491 U.S. 701, 733–36 (1989). Therefore, to establish a school district's liability under the Equal Protection Clause, a plaintiff must establish that her rights were violated pursuant to (a) an official district policy; or (b) "an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom

---

[1]    Given the number of Plaintiffs and volume of factual detail, Plaintiffs incorporate by reference their Statement of Additional Material Facts and Response to FCSD's Statement of Material Facts in lieu of a Statement of Facts.

and usage with the force of law"; or (c) through the conduct of a school district official with final policy-making authority as to the decisions that establish a constitutional violation. *Chabad Chayil Inc., v. School Board of Miami-Dade County Fla.,* 48 F.4th 1222, 1229 (11th Cir. 2022) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690–91 (1978)).

Plaintiffs first allege that the acts and omissions of principals and assistant principals at Coosa High are a sufficient foundation for *Monell* liability for purposes of the Section 1983 claim. Then, turning to the substance of the Equal Protection claim, they argue that the school administrators failed to take reasonable steps to remedy the widespread racial harassment to which Plaintiffs were subjected by certain white students; and that the conduct of Coosa High official reflects deliberate indifference to Plaintiffs' rights under both the Equal Protection Clause and Title VI.

**The basis for FCSD liability under Section 1993.**

At the outset, FCSD's challenge to *Monell* liability under Section 1983 focuses on the pervasive custom or practice prong of the standard, and the absence of evidence of district wide constitutional violations. (Doc. 48-1 at 9-10). But the rule in this circuit is that principals at a single school can serve as final policymakers for purposes of Section 1983 liability, provided a principal (or his assistant principals') disciplinary decisions or interpretations of district policy are

4

not subject to meaningful review by a higher-level district authority. *See Holloman Ex. Rel Holloman v. Harland*, 370 F.3d 1252, 1293 (11th Cir. 2004); *D.D.T. by and through S.C. v. Rockdale County Public Schools*, 580 F.Supp.3d 1314, 1338 (N.D. Ga. 2021) (Totenberg, J.,).

Applying the final policymaker standard here, FCSD's Superintendent Glenn White testified in deposition that "on a day-to-day basis, our principals and assistant principals" handle disciplinary decisions, except under a narrow range of circumstances involving the use of firearms or "drug situations" that would be elevated to the Superintendent and are inapplicable here. (Deposition of Glenn White ("White. Dep."), P. 20, L. 15-P.24, L.6). The sole disciplinary decisions by school administrators that are subject to review or appeal are ten-day suspensions. (*Id*. at P. 28, L.2-9). Because the conduct challenged under Plaintiffs' Equal Protection Clause claims relates to the manner in which school administrators exercised their ordinary disciplinary authority, those decisions were not subject to meaningful review and the Court need not determine that the School Board or Superintendent acted culpably. *See Holloman*, 370 F.3d at 1293 (when the Board did not "integrate itself" into the disciplinary process and effectively delegated "unreviewable [disciplinary authority]," the principal possessed final policymaking authority).

Because Plaintiffs do not contend that administrators at Coosa High participated in their harassment, in order to prevail on their Equal Protection claims, they must establish liability by showing either "(1) a history of widespread [harassment that] puts the [administrative officials] on notice of the need to correct the alleged deprivation, and he or she fails to do so or (2) [that an administrator's] improper custom or policy results in deliberate indifference to constitutional rights." *Williams v. Fulton County School District*, 181 F.Supp. 3d. 1089, 1127-28 (N.D. Ga. 2016 (Totenberg, J.) (internal citations omitted). Based on the Eleventh Circuit's recent ruling in *Adams v. Demopolis City Schools*, 80 F.4th 1259, 1273 (11th Cir. 2023), Plaintiffs' Title VI racial harassment claim is also governed by the deliberate indifference standard. Consequently, the two claims merge and depend on similar, if not identical, evidence.[2]

## **The Equal Protection analysis**

Plaintiffs have established through their deposition testimony that there was a widespread pattern of student harassment during their enrollment at Coosa High between 2019 and 2021.[3] Taking the evidence individually, Deserae Turner alleges

---

[2]      Courts have also interpreted Title VI to require a showing that the harassment rises to the level of severity or pervasiveness required to establish a hostile environment in employment cases. See *Thomas as next friend of Doe v. City Sch. of Decatur*, 2023 WL 7144696, at *9 (N.D. Ga. Sept. 20, 2023).

[3]      FCSD repeatedly suggests that Plaintiffs' sworn deposition testimony should be disregarded because it is "uncorroborated." But, in resolving a motion for summary judgment, the plaintiffs' versions of events must be credited, "even if it

that a classmate remarked that "I have black people hanging from my family tree," a clear "joke" about lynching (Deposition of Deserae Turner ("D.Turner Dep."), P. 36, L.5-15); that after she posted on social media about George Floyd's murder by asphyxiation by Minneapolis police officers, a student responded, "there's no way that 'n*****' couldn't breathe, look at that big nose that he have on him [sic]" (*Id*. at P. 41, L.14-19); that students ridiculed her locked or braided hairstyle by comparing the strands to "snakes" or "worms" and calling her "Medusa" (*Id*. at P. 42, L. 5-13); and that when she ate a banana at lunchtime, a student called her a "monkey" (*Id*. at P. 93, L.7-21).

Deserae's sister M.T. testified that a white student taunted her by holding a Confederate flag over her head while calling her a "n*****" (Deposition of M.T. ("M.T. Dep."), P. 64, L.18-21); and that she heard slurs like "n*****" and "porch monkey" "50 to a [100] times" in two years at Coosa High (*Id*. at P. 21, L–21-P. 22, L.15); that she encountered a white student brandishing what she called a whip and stating to her, "Do you know what this is? . . . It's what we used to whip you all with" (*Id*. at P.40, L. 2-20); and that a white student with a Confederate belt buckle told her, "You all are slaves…that's what you used to be called." (*Id*. at P. 77, L.

---

consists primarily or solely of [their] own self-serving . . . testimony." *Patterson v. Georgia Pacific, LLC*, 38 F.4th 1336, 1351 (11th Cir. 2022); *see also Price v. Times, Inc*., 416 F.3d 1327, 1345 (11th Cir. 2005) ("Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.").

5-11). M.T. was also called a "nappy headed niglet" and a "n*****" on an almost daily basis (*Id*. at P. 127, L.5-13).

Another of the Turner children, BT., was present during the incident with the Confederate belt wearing child who called blacks "slaves." (Deposition of B.T. ("B.T. Dep), P. 28, L.3 -15). B.T. testified that she was routinely subject to racist taunts. (*Id*. at P. 29, L.3-7). B.T. recounted several incidents where white students screamed the term "n*****" at black children walking down the hallway. (*Id*. at P. 65, L.16–P.67, L.10).

J.T.M, Jessica Murray's daughter, was also present during the incident with the student wearing a Confederate belt buckle. (Deposition of J.T.M. ("J.T.M. Dep."), P. 68, L.16-22). Multiple white students called J.T.M. "n*****" and pulled at her natural hair. (*Id*. at P.17, L.13-P. 20, L.21).

J.R.M, also Jessica Murray's daughter, testified that she was called "n*****", a "nappy haired niglet", and a nappy head, "n*****" monkey." (Deposition of J.R.M ("J.R.M. Dep."), P. 33, L.14-20; P. 36, L.4-6; 10-13; P. 45, L.23-P. 46, L.7; P. 49, L.6-P.50, L.11; P. 53, L.2-7; P. 123, L.10-15; Deposition of Jessica Murray ("J.Murray Dep."), P. 38, L.3-4.  On another occasion, a white male student told J.R.M. he was going to "take her back to the slave days" and "do you how your ancestors [were done]," a clear reference to the vile antebellum practice of raping enslaved black women. (*Id*. at P. 45, L.7-12, P. 140, L.11-P.141,

L.15). Another white student made the comment to J.R.M. that "all black girls got big asses." (*Id.* at P. 47, L.14-16).

Deserae, J.R.M, B.T. and M.T. also testified that they witnessed constant displays of the Confederate insignia on clothing and paraphernalia worn by white students. (D.Turner Dep., P. 139, L.20-P. 140, L.25 (clothing with Confederate images "was very common. It was, like, really a daily thing.")); J.R.M Dep., P.23, L.4-7 (observations of Confederate flags on hoodies); P. 143, L.19-25 (J.R.M. observed Confederate apparel two to five times a day, on a typical day); B.T. Dep., P. 45, L.5-P.46, L.23) ("[M]any white students [at Coosa High] wore Confederate gear"); M.T. Dep., P. 100, L. 4-8)).

During Plaintiffs' time at Coosa High, anti–black social media images were generated by white students. One student, Brody McJunkin, posted a video filmed on school property in which he engaged in a virulent racist rant laced with the term "n*****" and comments like "kill all n******." (D.Turner Dep., P. 69, L.16-22; M.T. Dep., P. 29, L.5-13; P. 57, L.6-9; B.T. Dep., P. 14, L.18-25). McJunkin also disseminated images of him staging a reenactment of the George Floyd killing by pressing his knee into the neck of another student. (M.T. Dep., P. 80, L.11-19). Another white student posted a photoshopped image of a black child in a bucket eating a watermelon, with the phrase, "Niglet for sale." (D.Turner Dep., P. 74, L.6-24; M.T. Dep., P. 34, L. 1-23; B.T. Dep., P. 21, L.21-P. 22,L.17).

In *Williams v. Fulton County. Sch. Dist.*, 181 F. Supp. 3d at 1121–22, the district court observed that while "[o]ne or two incidents" might be considered an isolated problem, "allegations of anything more than that are generally sufficient" to establish a pattern of harassment. *Id.* at 1122. A jury could reasonably find that the racist badgering of black students went well beyond isolated incidents. *Id.* (allegations of a "multi-year pattern of abuse" by one teacher directed at "several" students were "more than adequate to establish a pattern").[4]

In addition, Plaintiffs have established that administrators at Coosa High were on notice of rampant harassment of black students by their classmates. *Id.* at 1122. During their depositions, Plaintiffs recounted that they repeatedly reported racist incidents to Coosa High. Deserae Turner says that each of her four years at Coosa High, she told administrators and staff of racist conduct "more times than I can remember." (D.Turner Dep., P. 158, L.11-22). M.T. reported a white student holding a flag over M.T.'s head while calling her "n*****" to Assistant Principal Kristen Martin. (M.T. Dep., P. 76, L.18-20). M.T. also described bringing racist

---

[4]     FCSD suggests that *Monell* liability is "difficult, if not impossible" to prove based on conduct at a single school. That argument is irrelevant because of Plaintiffs' reliance on a principal-as-final policymaker *Monell* theory. By definition, such a theory presumes Section 1983 liability against a school district can be premised on conduct at a single school. Regardless, courts have held that plaintiffs can establish a widespread custom of deliberate indifference based on conduct occurring at a single school. *See, e.g.*, *N.R. by Ragan v. Sch. Bd. of Okaloosa County., Fla.*, 418 F. Supp. 3d 957, 992 (N.D. Fla. 2019) (viable *Monell* claim based on abuse occurring at one school over a two-year period).

behavior to the attention of school administrators "almost every day that I was at school". (*Id.* at P. 119, L.1-16). J.R.M recalled reporting to Martin that a classmate called her a "n*****." (J.R.M. Dep., P. 47, L.11). Jessica Murphy testified that she made 20-30 complaints to school administrators and district officials about racist harassment directed at her daughters. (J.Murray Dep., P. 149, L.17-150, L.22).

On other occasions, several plaintiffs testified that racist conduct by students was openly witnessed by Coosa High officials. According to B.T., Martin was easily in close enough proximity to hear the student with the Confederate belt buckle tell Deserae, M.T., and J.T.M and B.T. that they "used to be called slaves." (B.T. Dep., P. 28, L.3-15). B.T. also referred to several cases of white students loudly screaming "n*****" in the hallways in the presence of white administrators. (Id. at P. 65, L.16-P.67, L.10).

Plaintiffs' testimony further establishes that Coosa High officials consistently took no action to address rampant harassment of black children. As noted above, B.T. testified that Martin witnessed racist slurs firsthand and did nothing. Deserae Turner also testified that she told Martin of the "niglet for sale" image and that Martin claimed the school could not act because the post was made on school grounds. (D.Turner Dep., P. 77, L.9-18). But according to Superintendent White, the proper response to the incident would have been to investigate whether

the image was posted by a student, not to presume the school had no jurisdiction over the matter. (White Dep., P. 118, L.20-P. 119, L.10).

As to the ubiquitous presence of Confederate symbolism,[5] Principal Cox acknowledged that displays of the Rebel flag were prohibited by the district's handbook and were inappropriate on school grounds. (Deposition of Judson Cox ("Cox. Dep."), P. 76, L.21-P. 77, L.24). But M.T. contends that she was told by Martin that Confederate displays were permissible on the grounds that "the flag wasn't hate towards anyone . . . . It was for heritage." (M.T. Dep., P. 98, L.15-21). More fundamentally, as several Plaintiffs testified, they observed students wearing the Confederate flag throughout the course of a school day, which makes it clear students were not asked by administrators to remove these offensive articles of clothing. (J.R.M. Dep., P.144, L.20-P.145, L.6; D.Turner Dep., P.162, L.1-8).

Based on the totality of evidence, Plaintiffs allege facts sufficient to demonstrate that school officials knew harassment of black students by white students was a pervasive practice at Coosa High, yet they failed to take meaningful

---

[5]    The Eleventh Circuit recently held in *Yelling v. St. Vincent Health Care System*, 82 F.4th 1329, 1336 (11th Cir. 2023) that references to being a "confederate flag flyer" unaccompanied by racial slurs do not establish a pattern of racial harassment. But the context missing in *Yelling* is present in this case, where the record establishes ubiquitous racial epithets and insults by various students, including instances where they brandished the rebel flag and wore Confederate gear while they hurled racist slurs.

steps to deter the bullying and verbal abuse. That inaction is sufficient to establish the requisite level of discriminatory intent for an Equal Protection violation.

**Deliberate indifference to student-on-student racial harassment**

In addition, the evidence indicates that Coosa High administrators, as a matter of custom and practice, were deliberately indifferent to racist targeting of black children by some of their white classmates, which is the predicate for a Title VI violation and an alternative means of Equal Protection liability. FCSD suggests that Coosa High officials took some steps to correct racist behavior, particularly the suspension of Brody McJunkin after the emergence of his video in March 2021. But there is much in the record that undermines the narrative of responsiveness, or at least creates a fact question around it.

First, school officials admit they took no disciplinary action after the dissemination of McJunkin's George Floyd reenactment video beyond directing him not to engage in similar conduct during the upcoming school year. (White Dep., P. 64, L.19-P. 65, L.17). However, contrary to the artificial line FCSD draws to justify its failure to punish McJunkin – that the images were produced off-campus – school officials knew they possessed legal authority to address a provocation by a student regardless of whether it occurred on school grounds, as White admitted in the context of the "niglet for sale" image. (White Dep. P. 118, L.20-119, L.10). *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S.

13

Ct. 2038, 2045 (2021) ("[W]e do not believe the special characteristics that give schools additional license to regulate student speech always disappear when a school regulates speech that takes place off campus."); *S.C. v. Metropolitan Government of Nashville,* 86 F.4th 707, 716 (6th Cir. 2023) (in a deliberate indifference analysis involving the sharing of toxic social media images, the "more important consideration is the school's disciplinary authority" over the harassing students) (internal citations and quotations omitted)). In addition, crediting the Plaintiffs' testimony, the prevalence of Confederate images during the school day supports the inference that the school's efforts to contain the displays were inconsequential, to the point a jury could believe the inaction reflected indifference to the images.

As the Eleventh Circuit has observed, offering *some* response does not shield a district from liability if that response is "clearly unreasonable in light of the known circumstances." *Doe v. Sch. Bd. of Broward County., Fla.*, 604 F.3d 1248, 1260 (11th Cir. 2010). "Whether a response was clearly unreasonable depends on the time it took the district to respond to complaints, the level of response, the effort expended to respond to the allegations, and the efficacy." *Nissen v. Cedar Falls Community. Sch. Dist.*, 2022 WL 873612, at *9 (N.D. Iowa Mar. 23, 2022).

A district's response must be assessed in light of the persistence and pervasiveness of student-on-student harassment, not in isolation. "[W]here a school

district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior." *Doe*, 604 F.3d at 1261 (quoting *Vance v. Spencer County. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000)). Or, put another way, if a district's initial response fails to deter students from engaging in harassment, the district's failure to implement more significant or systemic interventions is unreasonable. *See, e.g.*, *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 668–671 (2d Cir. 2012) (holding that district which "immediately suspended nearly every student who was identified as harassing [the plaintiff]" could nevertheless be found deliberately indifferent to harassment because a rational juror could conclude that the district ignored signals that earlier action was necessary.). Even assuming the veracity of FCSD's claims that it periodically disciplined some white students other than McJunkin, these kinds of sporadic, "half-hearted" efforts "will [not] suffice to shield a school from liability." *S.B. ex rel. A.L. v. Bd. of Educ. of Harford County.*, 819 F.3d 69, 77 (4th Cir. 2016).

There is also the contrast between the aggressive response at Coosa High to a student-led protest in October 2021 and the school's failure to proactively address racial tensions including McJunkin's threats of racial violence. Armed police officers were posted at school the day of the planned protest rally, but Cox acknowledged that there was no similar police presence in the aftermath of the

McJunkin videos. (Cox. Dep., P. 156, L.7-P. 157, L.3). Similarly, while Cox made an intercom announcement discouraging the anti-racism protest and threatening discipline against participants, he did not make a similar address to the student body that Coosa that violence or threats of violence against black children would not be tolerated. (*Id.*, at P. 193, L.6-P. 195, L.4).[6]  Equally telling, although FCSD contends that four of the Plaintiffs were suspended for loud behavior during a meeting in the administrative lobby the day before the protest, when a group of white students heckled Deserae Turner, M.T., B.T., and J.R.M. with racial slurs while they were leaving school that day, several administrators watched and did nothing. (D.Turner, P. 164, L.3-23). Furthermore, Cox and his predecessor, La Donna Turrentine, responded to M.T's reposting of the McJunkin videos by threatening to expel her for putting McJunkin at risk. (M.T. Dep., P.115, L.17-20; P. 118, L.15-22).

---

[6]     Cox's inclination to not respond as dramatically to the harassment of black children hints that he and his leadership team downplayed the seriousness of the problem. In deposition, Cox could not restrain himself from exclaiming that the Plaintiffs are "absolutely lying." (Cox. Dep., P. 79, L. 11-12). When Cox met with a group of the organizers of the protest after his intercom announcement, he pointedly said "there's no racism at Coosa." (M.T. Dep., P. 112, L.19-20). *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 703 (4th Cir. 2018) (evidence that university "sought to downplay the harassment and threats" students received supported finding of deliberate indifference); *K.R. by & through Proctor v. Duluth Pub. Sch. Acad.*, 591 F. Supp. 3d 418, 430 (D. Minn. 2022) ("There is ample evidence in the record that could lead to a finding that school officials did not treat racism with appropriate seriousness, and instead downplayed, minimized, and even ignored the serious nature of the racist comments.").

Finally, a jury could draw the inference that the persistent claims of racist behavior by the Plaintiffs and at least one of their parents, Jessica Murray, is itself indicative that harassment was continuing unabated, and that more substantial efforts were needed to address it. Failing to deviate from an approach that the district knew was ineffective supports a finding of deliberate indifference. *See S.E.S. as next friend of J.M.S. v. Galena Unified Sch. Dist. No. 499*, 446 F. Supp. 3d 743, 800 (D. Kan. 2020) (denying summary judgment when district "was deliberately indifferent [when] it continued to respond to allegations of sex-based harassment with verbal admonishments to the student-harassers, even after it knew this remedial measure had proved ineffective").

FCSD's failure to implement (or even consider) a more meaningful response to continuing harassment distinguishes this case from *Adams*, where the Eleventh Circuit rejected a Title VI deliberate indifference theory. There, the evidence indicated that even though their efforts were tragically futile, school officials made a "reasonable attempt to rectify the bullying" by devising a "safety plan" in which the child targeted for harassment could leave the classroom if she felt threatened by the bullying. *Adams*, 80 F.4th at 1271. Here, by contrast, Coosa High seems to have opted for no response stronger than piecemeal and sporadic. Accordingly,

Plaintiffs' Title VI and Equal Protection claims based on student-on-student

harassment claims are entitled to be heard by a jury.[7]

**FCSD's discriminatory application of its disciplinary policies**

Four of the Plaintiffs, Deserae Turner, J.R.M., M.T. and B.T, contend that

their five day out-of-school suspension the day before the October 2021

anti-racism protest violated the Equal Protection clause on the grounds "that other

similarly-situated individuals outside of [their] protected class were treated more

favorably." *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1180 (11th Cir. 2009). An

Equal Protection claim requires proof of a discriminatory intent, which in this case

examines the motivations of the final policymaking authority at Coosa High,

Judson Cox. *Adams*, 80 F.4th at 1273.[8] FCSD's argument for summary judgment

on this claim fails for at least two reasons.

---

[7]     FCSD suggests at one point "no Plaintiff has presented evidence that she experienced severe, pervasive harassment directed at her", and remarkably, the district even equates the harassment aimed at the plaintiffs to "banter" or "teasing." (Doc. 48-1 at 22). That argument is equal parts offensive and absurd. The Eleventh Circuit went out of its way to reject a similar minimization of hate in *Adams*, and this Court should do the same. 80 F.4th at 1272 ("[W]e reject the defendants' assertion that . . . sexualized and racialized comments on [a Black student's] skin tone, hair, and physical appearance, and name calling such as "n*****," "black bitch," "dumb black bitch," and "pussy ass bitch" amounts to . . . childish name-calling and teasing . . . . We have no doubt that such conduct at least raises a question of fact whether the harassment . . . was severe and pervasive.").

[8] Because five-day suspensions are not reviewable, Principal Cox is the final policymaking authority for Monell purposes. *Supra* at 5.

First, there is a genuine issue of material fact regarding the rationale for the suspensions. FCSD asserts that Deserae, J.R.M, M.T and B.T became loud and belligerent in the school lobby and refused to return to class after Cox held an impromptu meeting with students to engage the protests. But Superintendent White conceded in his deposition that when he reviewed a video of the incident, only one of the children in the lobby was engaging in cursing and yelling, which undercuts Cox's claim. (White Dep., P.173, L.1-14). Deserae Turner specifically denied yelling or raising her voice. (D.Turner Dep., P. 118, L.4-6). *See Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1324 (11th Cir. 2023) (summary judgment inappropriate where employer's explanation for termination was argumentative and insubordinate behavior but the plaintiff "insists that the conduct itself never happened").

Further discrediting Cox's rationale is that a non-African student admitted to Lekisha Turner, the mother of Deserae, M.T. and B.T., that she behaved in a loud disruptive manner in the lobby but was not suspended. (Deposition of Lekisha Turner ("L.Turner Dep."), P. 123, L.5-9). Then there is Deserae's testimony that a short time later, a group of white students loudly heckled her, M.T., B.T. and J.R.M. with racial slurs while they were waiting to be picked up by Ms. Murray, in full view of several school administrators. (D.Turner Dep., P. 163, L.3-23). The evidence that other children caused a commotion or became loud without being

disciplined contradicts the narrative that the suspension was motivated by unruly conduct.

Even if the record does not establish that other students who were not suspended engaged in identical or substantially similar behavior, or is ambiguous on that score, the four suspended Plaintiffs need not establish such a precise point of comparison: instead, they need only demonstrate that Coosa High inconsistently applied its disciplinary authority to the detriment of individuals in a protected class. *See Lewis v. City of Union City, Georgia II*, 934 F.3d 1169, 1188 (11th Cir. 2019). Finally, plaintiffs asserting an Equal Protection claim under Section 1983 may rely on a mixed motive theory, which requires proof that race was a "motivating factor" for a challenged decision, even though other non-discriminatory factors may have contributed as well. *See Quigg v. Thomas County School District*, 814 F.3d 1227, 1235 (11th Cir. 2016) (citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977)). Given the evidence that a total of six African American children were suspended when white students who engaged in comparable conduct were not, Deserae Turner, J.R.M., B.T. and M.T. have established a triable issue of discriminatory intent that violates the Equal Protection Clause.

**B. <u>Plaintiffs' First Amendment viewpoint discrimination claim</u>**

"[S]tudents do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the schoolhouse gate.'" *Mahanoy*, 141 S. Ct. at 2044 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). But their First Amendment rights are tailored "in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506. Public schools "must tolerate [pure student] expression unless they can reasonably forecast that the expression will lead to 'substantial disruption of or material interference with school activities.'" *Bannon v. Sch. Dist. of Palm Beach County.*, 387 F.3d 1208, 1213 (11th Cir. 2004) (quoting *Tinker*, 393 U.S. at 514).

Facially neutral content-based restrictions on student speech are typically subject to *Tinker's* "substantial disruption" standard. However, as the Eleventh Circuit recently confirmed, the *Tinker* standard "doesn't apply to viewpoint-based restrictions." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022). Even if, under *Tinker*, a public school can "restrict harassing speech that disrupts the school's functions, it c[annot] do so . . . based on the viewpoint of that speech." *Id.* Speech restrictions "'based on viewpoint are prohibited,' seemingly as a *per se* matter." *Id.* at 1126 (quoting *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018)).

**FCSD's discriminatory application of the dress code**

There is ample evidence that FCSD engaged in impermissible viewpoint discrimination by enforcing its dress code to prohibit clothing with Black Lives Matter or George Floyd imagery but to permit clothing displaying the Confederate flag. The "appl[ication] [of] facially neutral regulations in a discriminatory manner" is impermissible viewpoint discrimination under the First Amendment. *Biddulph v. Mortham*, 89 F.3d 1491, 1500 (11th Cir. 1996). "The critical question, therefore, is whether the school has enforced its facially neutral, written dress code . . . in a viewpoint-discriminatory manner." *Barr*, 538 F.3d at 573..

While Principal Cox testified that he did not view messages promoting the Black Lives Matter ("BLM") movement as inherently disruptive (Cox. Dep., P. 24, L.3-P. 25, L.4), two Plaintiffs have testified that they were directed to remove or turn inside out T-shirts with BLM or George Floyd images or face disciplinary consequences. (M.T. Dep., P. 93, L.11-94, L.25; J.R.M. Dep. P. 31, L.20-P. 33, L.5). In contrast, white students wore clothing displaying the Confederate insignia on a near-daily basis. *Supra* at 10. Even if school administrators viewed BLM or George Floyd images as provocative, they engaged in textbook viewpoint discrimination by "pick[ing] and choos[ing] which types of disruptive speech to prohibit." *Speech First*, 32 F.4th at 1127 n.6.[9]

---

[9]     The *Monell* analysis regarding the dress code policy is similar to the analysis regarding disciplinary policies. Superintendent White testified that the

**C. Plaintiffs' First Amendment retaliation claim**

The four suspended Plaintiffs, Deserae Turner, J.R.M, M.T. and B.T., also assert a First Amendment retaliation claim, which requires evidence that: (1) their speech was constitutionally protected; (2) Defendant's retaliatory conduct adversely affected or chilled the protected speech; and (3) there is a causal connection between the retaliatory actions and the adverse effect on speech. *See Zen Group, Inc. v. Agency for Health Care Administration*, 80 F.4th 1319 (11th Cir. 2023).[10]

Under the first prong of the retaliation analysis, the evidence suggests that the planned protest activities were constitutionally protected under the *Tinker* standard. A protest occurring during school hours is not presumptively disruptive. *See Potrzeba v. Sherburne-Earlville High Sch. through Sherburne-Earlville Cent. Sch. Dist. Bd. of Educ.*, 2023 WL 8827178, at *8 (N.D.N.Y. Dec. 21, 2023)

---

interpretation of the dress code is left at the discretion of school administrators. (White Dep., P. 31, L.6-9). As a result, under *Monell*, Coosa High administrators constitute the final policy-making authority regarding the interpretation of the dress code.

[10]   To hold FCSD liable for a First Amendment violation, Plaintiffs must once again satisfy the *Monell* requirements. *Holloman*, 370 F.3d at 1290. Here, there is ample evidence that the hostility to a protest on school grounds does flow out of a district-wide custom and policy. According to Superintendent White, "Any protest during the school day would violate school policy" (White Dep., P. 161, L.22-23). That categorical assertion, echoed in Cox' message to the student body, is evidence suggesting FCSD as a matter of policy prohibited all student protests, without performing the individualized disruption analysis required in *Tinker*.

(student walkout during school hours is permissible under *Tinker*). Nor may a school prohibit students from possession or distribution of unapproved flyers. *See Gilio ex rel. J.G. v. Sch. Bd. of Hillsborough County., Fla.*, 905 F. Supp. 2d 1262, 1272 (M.D. Fla. 2012) (policy prohibiting student from distributing invitations to religious event violated the First Amendment). Given the evidence that organizers intended for students to participate in the protest "in between classes . . . so that our school work would not be disturbed," (B.T. Dep., P. 37, L.1-7), and the fact that the event occurred "off-campus . . . . on a public road" (White Dep. P. 156, L.1-12), there is at minimum a fact issue regarding whether it was reasonable for FCSD officials to presume the protest would be substantially disruptive under *Tinker*.

FCSD does not dispute that an out-of-school suspension would reasonably deter First Amendment activity, but it challenges the causal connection between the suspension and speech. According to FCSD, it was the students' allegedly disruptive behavior in the hallway that motivated the suspension of four of the Plaintiffs. But as noted above, the claim of disruption is countered by the denials of at least one suspended Plaintiff, Deserae Turner; Superintendent White's own account of what he observed on a video recording of the incident; and the evidence that another child who was not black acted in a loud and unruly manner without incurring a suspension. *Supra* at 19-20. Given the evidence, a jury could disbelieve Cox's stated explanation as pretextual.

24

The record contains the following evidence: that on October 6, the day before the protest, Cox made an announcement on the intercom that the protest would not be permitted, and that possession of flyers promoting the protest would "be considered a discipline issue" (Cox. Dep., P. 129, L.23-P. 130, L.20); Deserae Turner was taken out of class and threatened with jail for planning a protest (D.Turner Dep., P. 104, L.3-P.104, L.19); Cox invited students who had questions about his announcement to gather in the area around his office (Id. at P. 114, L.1-24); that the students were then asked to write down their names (Cox. Dep, P. 142, L. 23-P. 143, L.3); and that six students who reported to the lobby and had earlier participated in a group chat that organized the protest ended up being suspended that afternoon. (J.R.M. Dep., P. 63, L.2-68:7).

A jury could reasonably infer that Cox's invitation to dialogue was nothing more than an effort to identify the students driving the protest, and that the black students who reported to the lobby made themselves natural targets. In any case, the "[c]lose temporal proximity between the threat to punish students for exercising their First Amendment rights…and the imposition of discipline is strong evidence of a "causal link" between these events. *Ingram v. Buford City Sch. Dist.*, 2018 WL 7079179 at *12 (N.D. Ga. Dec. 17, 2018). There is at least a triable issue regarding the First Amendment retaliation claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment should be denied.

Respectfully submitted this 22nd day of January, 2024.

<table>
<tr>
<td>

_s/Artur Davis_
**HKM Employment Attorneys, LP**
2024 3rd Avenue, North Suite 212
Birmingham, AL  35203
T:  205-881-0935
_(admitted pro hac vice)_
E:  adavis@hkm.com
**Attorney for Plaintiffs**

</td>
<td>

Harry M. Daniels
**The Law Offices of Harry Daniels**
233 Peachtree St., NE, Suite 1200
Atlanta, GA 30303
T:  404-620-6110
E:  daniels@harrymdaniels.com
**Attorney for Plaintiffs**

</td>
</tr>
</table>

Shannon Liss-Riordan
Sam Davis
**Lichten & Liss-Riordan, P.C.**
729 Boylston Street, Suite 2000
Boston, MA 02116
T: 617-995-5800
_(admitted pro hac vice)_
E: sliss@llrlaw.ocm
   sdavis@llrlaw.com
**Attorneys for Plaintiffs**

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in local rule 5.1(C) and 7.1(D).

Respectfully submitted this 22nd day of January, 2024.

**HKM Employment Attorneys LLP**

*s/Artur Davis*
Artur Davis
ASB-3672-D56A
2024 3rd Ave. North, Suite 212
Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on January 22, 2024, **Plaintiffs' Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment** was served electronically through this Court's CM/ECF system on lead counsel for **Defendant Floyd County School District**, listed below:

Richard Sheinis
**Hall Booth Smith PC**
11215 North Community House Road
Suite 750
Charlotte NC 28277
rsheinis@hallboothsmith.com
**Lead Counsel for Defendant**

By: s/ *Artur Davis*
Artur Davis
adavis@hkm.com
**HKM Employment Attorneys LLP**
2024 3rd Ave. N Suite 212
Birmingham, AL 35203
Telephone: 205-881-0935
**Counsel for Plaintiffs**