**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | |
|---|---|
| DESERAE TURNER, et al., | |
| Plaintiffs, | CIVIL ACTION FILE NO. |
| v. | 4:22-cv-00113-LMM |
| FLOYD COUNTY SCHOOL DISTRICT, | |
| Defendant. | |

**DEFENDANT FLOYD COUNTY SCHOOL DISTRICT'S REPLY**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

COMES NOW, the Defendant, Floyd County School District, by and through undersigned counsel, and pursuant to the Federal Rules of Civil Procedure and LR 56, hereby files its Reply in Support of its Motion for Summary Judgment, stating as follows:

At this stage, Plaintiffs have the burden of putting forth sufficient evidence to create a *genuine* issue of material fact. They have failed to do so. Their § 1983 claims fail because, as they acknowledge in their response, there is no evidence of a well-settled pervasive custom throughout the Floyd County School District (the "School District"), and Principal Cox is not an official with *final* policymaking authority whose conduct subjects the School District to § 1983 liability under *Monell*. Plaintiffs' Title VI race discrimination claim fails because there is no evidence that the School District was deliberately indifferent to severe, pervasive, and objectively

offensive harassment of which the School District had actual knowledge. Finally, Plaintiff's Title VI retaliation claim fails because Plaintiffs failed to respond to the School District's Motion regarding this claim and failed to present evidence that the School District's legitimate reasons for its actions are pretext.

## A. The principal and assistant principals are not final policymakers.

Summary judgment is proper on all of Plaintiffs' § 1983 claims (Counts I-III) because there is no basis for holding the School District liable under *Monell*. (*See* Def.'s Br. in Spt. of its Mot. Summ. J. [Dkt. 48-1] at 8-11.) School boards cannot be held liable for constitutional deprivations unless they result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." *Denno*, 218 F.3d *v. Sch. Bd. of Volusia Cty., Fla.*, 218 F.3d 1267, 1276 (11th Cir. 2000) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1978). There is no official government policy at issue here. Plaintiffs originally alleged a widespread custom or practice, but now they concede that there is an "absence of evidence of district wide constitutional violations." (*See* Pls.' Mem. [Dkt. 70-1] at 4.) Now, first the first time, Plaintiffs attempt to satisfy *Monell* by arguing that Principal Cox is a "final policymaker" whose actions subject the School District to § 1983 liability. (*See* Pls.' Mem. [Dkt. 70-1] at 4-5.)

Plaintiffs' new argument is misplaced. Cox is not a final policymaker for the

School District as a matter of law. *See Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1264 (11th Cir. 2010) (Whether someone has "final policymaking authority for the defendant is a matter of state law *to be determined by the trial judge and not the jury*.") (cits. omitted; emph. added).[1] Cox is not a final policymaker for the School District under Georgia's Constitution, by statute, or in practice.

Local school systems are "under the management and control of a board of education…" GA. CONST., Art. VIII, § 5, ¶ II; *see also* O.C.G.A. § 20-2-50; *Chaney v. Fayette Cnty. Pub. Sch. Dist.*, 977 F. Supp. 2d 1308, 1319 (N.D. Ga. 2013) ("Georgia law explicitly confines control and management of a school district to the county board of education,…and 'a county board is without power to delegate its authority to manage the affairs of the school district.'" (quoting *State Bd. of Educ. v. Elbert Cnty. Bd. of Educ.*, 112 Ga. App. 840, 846 (1965)). The School Board hires and supervises the superintendent (Daniel Dep. at 19:14-16), who supervises school principals (Cox Dep. [Dkt. 69-2] at 102:4-6).

---

[1] Plaintiffs only cite one case in which a principal had final policymaking authority. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004). There, the principal paddled a student mere days before graduation. Because there was not enough time for the School Board to review the paddling before graduation—and because the paddling could not be undone—the court found in that *particular* instance, there was no opportunity for meaningful review. *Holloman*, 370 F.3d at 1293. The Eleventh Circuit cautioned, "our holding that [the principal] acted as a final decision maker in this context does not mean that he always acts as such….[o]n other occasions, where there is a meaningful opportunity for substantive Board review, or where a punishment is not a *fait accompli* or otherwise irreversible," the principal would not be regarded as a final policymaker. *Id*.

In *Doe*, the plaintiff claimed the school principal failed to properly investigate or address her sexual harassment complaints. She relied on the "final policymaker theory of liability" to argue the School Board was responsible for the principal's conduct. *Doe*, 604 F.3d at 1264. The Eleventh Circuit held that even though the principal had discretion to decide whether to investigate the student complaint, he was not a *final* policymaker because his superiors (including the Superintendent) retained the authority to review the exercise of his discretion. *Id.*

In this case, like in *Doe,* the superintendent and School Board retain the power to review Cox's decisions—precluding him from being a *final* policymaker as a matter of law. *See Doe*, 604 F.3d at 1265. Cox testified about his regular communications with the superintendent and director of student services to decide how to handle disciplinary matters, get clarity about the handbook, and inquire about discipline questions as they arise throughout the day. (Cox Dep. [Dkt. 69-2] at 102:6-8; 104:4-14.) The superintendent, Glenn White, testified that he talked with Cox throughout the concerns about racial issues at Coosa High to "make sure [we] were on top of the situation,…seeing if there are any other issues, anything like that." (White Dep. [Dkt. 69-1] at 197:10-15.) White and Cox discussed the planned protest to determine "what steps ought to be taken" to address it. (*Id*. at 161:24-162:4.)

Similarly, when LaDonna Turrentine was principal of Coosa High, she would refer to or call her superiors, including the director of student services, to get

clarification if she was ever unsure about the handbook. (Turrentine Dep. at 24:13-19.) If the director of student services was unsure, "they would seek counsel above them and get back to [her]…" (*Id*. at 25:2-10.) When she learned about some of the social media posts at issue in this case, she immediately contacted the director of student services (*id*. at 56:17-22), and she "sought advice from [the] director of student services and superintendent" on how to word a call to parents about the issue (*id*. at 60:1-9). She also followed the instructions of her superiors in handling the George Floyd challenge issue. (*Id*. at 83:8-11; 84:6-8.)

Parents of students knew they could go above the principal's head if they were unsatisfied with how the principal was handling a situation. For example, the father of one student called and spoke with Dr. White on several occasions about changing his son's discipline. (White Dep. [Dkt. 69-1] at 68:1-5.) Plaintiff Jessica Murray emailed Dr. White about concerns, and Dr. White "agree[d] to allow [her] to deliver and pick up [her] children." (*Id*. at 188:6-18; 191:22-23.) Cox is not a final policymaker, and his actions do not subject the School District to § 1983 liability.

### B. Even if Cox were a final policymaker for the School District, there is no evidence that he violated Plaintiffs' Constitutional rights.

#### 1. Count I – Equal Protection

Plaintiffs fail to present any evidence that Cox was aware of—and deliberately indifferent to—widespread racial harassment under the rigorous and exacting standard applicable to equal protection and Title VI claims. They fail to meet their

burden of showing that Cox acted with the intent to discriminate against Plaintiffs, as is required to show a violation of the equal protection clause. *See Red Door Asian Bistro v. City of Fort Lauderdale*, No. 22-11489, 2023 WL 5606088 (11th Cir. Aug. 30, 2023) ("Proof of discriminatory purpose is required to show a violation of the equal protection clause.") (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985); *Jones v. Bd. of Comm'rs of Ala. State Bar*, 737 F.2d 996, 1003 (11th Cir. 1984)).

### 2.    Count II – Free Speech (Dress Code)

Plaintiffs claim that the School Board—acting through Cox as a final policymaker—violated the First Amendment through viewpoint discrimination by allowing students to wear Confederate flags but disallowing Black Lives Matter and George Floyd t-shirts. Plaintiffs identify a single instance in which Cox allegedly disallowed a George Floyd t-shirt, but there is no evidence that Cox ever allowed students to wear Confederate flags. Plaintiffs rely on broad allegations that they saw students wearing the flag often (although J.T.M testified she only saw it once in her years at Coosa (J.T.M. Dep. [Dkt. 51-3] at 71:8-10)), combined with pure speculation that Cox must have seen the flags and must not have done anything about them. This is not enough to create a *genuine* issue of fact for a jury. *See Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018) ("Conclusory allegations and speculation are insufficient to create a genuine issue of material fact.")

Plaintiffs have not produced any evidence that Cox was aware of a student

wearing or holding a Confederate flag and simply ignored it. They offer no facts or evidence to rebut Cox's testimony that he did not consider the Confederate flag appropriate school attire, and he did not allow it in the school. (Cox. Dep. [Dkt. 69-2] at 76:10-24; 77:8-14; 81:2-3.) Yet Plaintiffs assert that Cox's alleged one-time decision to disallow a George Floyd shirt amounts to a policy of the *Floyd County School District* to discriminate on the basis of viewpoint.

### 3. Count III – Free Speech (Protest)

Plaintiffs Deserae Turner, J.R.M., M.T., and B.T. claim they were suspended for planning a protest in violation of their First Amendment free speech rights. (*See* Am. Compl. [Dkt. 24] at ¶ 89.) Plaintiffs do not dispute the following facts:

- On Thursday, October 7, 2021, Principal Cox made an announcement stating that a protest would not be allowed at CHS and those in possession of flyers related to the protest should bring them to the office immediately (Pls.' Resp. to Def.'s SMF [Dkt. 70-10] ¶ 34);

- Approximately 10-15 students went to the Coosa High lobby (*id.* ¶ 35);

- The students were told that if they wanted to speak with Principal Cox about their concerns, they should write their names on a pad being provided, and Principal Cox would call them to his office one at a time to speak to him (*id.* ¶ 37);

- The students were instructed to return to class after writing their names on the pad, and some students returned to class (*id.* ¶ 38);

- The students who returned to class when instructed to do so were not suspended (*id.* ¶ 41).[2]

---

[2] Plaintiffs purport to dispute this fact, but they only cite to a portion of White's deposition in which Plaintiffs' counsel is reading an email from Jessica Murray,

The undisputed facts are that of the 10-15 students who went to the lobby, those who returned to class when instructed to do so were not suspended. Yet Plaintiffs contend that the real reason for their suspension was their role in organizing the protest. This contention is purely speculative and conclusory. There is no evidence that Cox believed the four suspended Plaintiffs were somehow more involved in organizing the protest than the other students who came to the lobby, wrote their names on the list, and returned to class—who were not suspended. There is no evidence that Cox suspended these Plaintiffs for planning the protest instead of their refusal to return to class.

### C. Plaintiffs' Title VI race discrimination claim (Count IV) fails because there is no evidence that the School District was deliberately indifferent to severe, pervasive, and objectively offensive harassment of which it had actual knowledge.

Plaintiffs agree that the rigorous deliberate indifference standard applies to their equal protection claims and Section VI claims. (Pls.' Mem. [Dkt. 70-1] at 6.) Plaintiffs also acknowledge that Title VI requires "a showing that the harassment rises to the level of severity or pervasiveness required to establish a hostile environment in employment cases." (*Id*. at n. 2.) Yet Plaintiffs' evidence amounts to isolated remarks by students over the course of several years—most of which were not reported to school administrators—and social media posts by students, which

which is inadmissible hearsay. Therefore, this fact should be accepted as true for purposes of the motion for summary judgment. (*See* Local Rule 56.1(B)(2)(a)(2).

were either outside of the School District's control or were dealt with promptly by the school.[3] At this stage, Plaintiffs have the burden of going beyond the pleadings and presenting affirmative evidence to show that a genuine issue of fact does exist. *See Brinkley v. Waters*, 2:18-CV-89, 2021 WL 1233352, at *5 (S.D. Ga. Mar. 31, 2021) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

As in the employment context, each plaintiff's experience should be considered individually to evaluate whether that plaintiff experienced an objectively hostile environment. *See Adams,* 754 F.3d at 1251-58. Factors for consideration include "(1) the conduct's frequency, (2) its severity, [and] (3) whether it was physically threatening or humiliating, rather than 'mere offensive utterance[s]…'" *See Yelling v. St. Vincent's Health Sys.,* 82 F.4th 1329, 1335 (11th Cir. 2023).

### 1. Deserae Turner

Plaintiffs point to four instances of alleged racism Desirae experienced during her four years at Coosa: 1) a classmate remarked that "I have black people hanging from my family tree"; 2) "after she posted on social media about George Floyd's murder by asphyxiation by Minneapolis police officers, a student responded, 'there's no way that 'n*****' couldn't breathe, look at that big nose that he have on him

---

[3] Further, there is evidence that Plaintiffs voluntarily viewed and re-shared these posts. Where a plaintiff willingly accepts photographs and does not ask that the sender stop sending them or tell the senders she feels harassed by them, they do not create an objectively hostile environment. *See Adams v. Austal*, U.S.A., L.L.C., 754 F.3d 1240, 1256 (11th Cir. 2014).

[sic]'; 3) students ridiculed her locked or braided hairstyle by comparing the strands to "snakes" or "worms" and calling her "Medusa"; and 4) "when she ate a banana at lunchtime, a student called her a 'monkey.'" (Pls.' Mem. [Dkt. 70-1] at 6-7.)

Deserae identified two isolated comments—the "family tree" and the "monkey eating a banana" comments—over the course of her four years at Coosa. There is no evidence that the "family tree" comment was reported to an administrator. *See Hill v. Cundiff*, 797 F.3d 948, 968 (11th Cir. 2015) (a "funding recipient is liable for student-on-student harassment if it is 'deliberately indifferent to [] harassment, of which [it] has ***actual knowledge***…'") (emphasis added). Deserae testified that she reported the "monkey eating a banana" comment to her band teacher, and she "remember[s] saying something to Ms. Turrentine," (D. Turner Dep. [Dkt. 51-5] at 94.:5-7) but she does not know if the student was disciplined. (D. Turner Dep. [Dkt. 51-5] at 94:8-11). Plaintiffs cannot rely on speculation that any disciplinary decisions under these circumstances were unreasonable.

Desirae also testified that a group of boys in her class would laugh and pick fun at her hair during her sophomore year. (D. Turner Dep. [Dkt. 51-5] at 44:8-13.) She claims that she reported it to her band teacher, and he responded by complimenting her and encouraging her. According to Deserae, "every single time [she] got her hair done, he…would tell [her], I love the new hairstyle." (*Id*. at 44:22-24.) There is no evidence that the negative comments about Deserae's hair—even

assuming they were race-based—were ever reported to any administrator or anyone else who would qualify as an "appropriate person" within the School District.

The interaction Plaintiffs describe regarding Deserae's George Floyd post took place on social media. There is no evidence that it took place on school grounds or was otherwise subject to the school's control or disciplinary authority. The School District is not responsible for behavior over which it has no control. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 630 (1999) (for deliberate indifference to occur, "the harassment must take place in a context subject to the school district's control."); *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2047 (2021) (school violated a student's First Amendment right to free speech by disciplining her for social media posts, which appeared outside of school hours from a location outside the school). Further, there is no evidence that this comment was ever reported to any administrator. Desirae testified that she told her mom about it, but that she did not tell anyone else. (D. Turner Dep. [Dkt. 51-5] at 44.) Even if an appropriate person within the School District had actual knowledge of this message Deserae received on social media, it would not have had the authority to discipline the student for messages sent outside of the school setting. *See Davis*, 526 U.S. at 649 ("it [is] entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims.")

Plaintiffs refer to an incident on the bus ramp involving a boy wearing a

Confederate flag[4] belt buckle. They claim it is an example of racism, but Deserae's account of that interaction tells a much different story. According to Deserae, J.T.M. confronted the boy and asked him, "Why do you feel that it's okay that you can wear that at school and that is like a hate symbol?". Only then did the boy respond, "I'm sorry that y'all were slaves…. I'm sorry. It's not my fault that y'all were slaves and that this…[t]his is heritage, not hate." (D. Turner Dep. [Dkt. 51-5] at 134:6-12.)

Taking Deserae's testimony as true for purposes of this motion, these isolated instances are not sufficiently severe, frequent, or pervasive to create an objectively hostile environment. No student should ever have to be exposed to any form of name-calling or bullying, but isolated incidents of this unfortunate behavior do not rise to the level necessary to impose liability on a School District under the equal

---

[4] There is conflicting evidence and testimony—even among Plaintiffs—about whether Coosa students regularly wore the Confederate flag. J.T.M. testified she did not see any Confederate flags on campus in person (J.T.M. Dep. [Dkt. 51-3] at 71:2-4) and she did not see any Confederate flag apparel except the belt buckle on the boy on the bus ramp (*id.* at 71:8-10); *see also* Pls.' Resp. to SMF [Dkt. 70-10] ¶ 27.) School administrators testified the Confederate flag was not allowed, and the students who carried flag were suspended. (K. Martin Aff. [Dkt. 58-1] ¶¶ 7-8; Cox Dep. [Dkt. 69-2] at 77:8-78:4.) But even taking the evidence in the light most favorable to the plaintiffs who claim they saw the flag regularly, exposure to the Confederate flag on a regular basis is not enough to create an objectively hostile environment. *See Adams*, 754 F.3d at 1254 (employee who saw Confederate flags every day, saw racist graffiti, and heard racist statement over the walky-talky did not present enough evidence to create a genuine question of fact as to a hostile work environment); *Yelling*, 82 F.4th at 1336-37 (coworkers' comments about being "confederate flag flyers" were not racial harassment; even if they were, they still would not—alone or in conjunction with the evidence of race-based harassment the plaintiff offered—be sufficient to show a hostile environment).

protection clause or Title VI.

### 2. B.T.

Plaintiffs allege B.T. was: 1) "present during the incident with the Confederate belt wearing child who called blacks 'slaves'"; 2) "routinely subject to racist taunts"; and 3) experienced "several incidents where white students screamed the term 'n****' at black children walking down the hallway." (Pls.' Mem. [Dkt. 70-1] at 8.)

Regarding the belt buckle incident, there is no evidence that any racial comments were directed toward B.T., who testified that she merely overheard M.T. and J.T.M. talking to the boy. According to B.T., she overheard the boy say, "[y]ou-all used to be slaves, or something along those lines." (B.T. Dep. [Dkt. 51-7] at 28:9-15.) This is consistent with Deserae's testimony that the boy was expressing his sympathy about slavery and explaining that he wore the belt buckle for "heritage, not hate." (*See* D. Turner Dep. [Dkt. 51-5] at 134:6-12.) Isolated incidents that do not involve a plaintiff directly and harassment of others that a plaintiff learns about do not create an objectively hostile environment. *See Adams,* 754 F.3d at 1256.

Plaintiffs claim that B.T. was "routinely subject to racist taunts," but she testified that she "can't really remember any of them." (B.T. Dep. [Dkt. 51-7] at 29:5-6.)[5] Although she claims she heard one student say racist things, including,

---

[5] Because B.T.'s blanket statement is nothing more "than a repetition of [her] conclusional allegations, summary judgment for the [the School District is] not

"nigger, like, every day," (id. at 29:22-23), she did not report it to anyone (id. at 30:2-3), and there is no evidence that the word was directed toward B.T. She claims she told Kristen Martin about one student whispering "nigger" under her breath, but she did not know the student's name. (Id. at 33:14-24.) She does not remember reporting anything else to Kristen Martin. (Id. Dep. at 33:25-34:2.)[6]

B.T.'s broad, general allegations that she was "routinely" subject to racist taunts and name-calling—without any specific facts regarding the nature or timing—are not sufficient to create a *genuine* issue of fact for a jury. *See Yelling,* 82 F.4th at 1335 (summary judgment proper where plaintiff's testimony that her workplace "became 'kind of heated' with racist comments and that her coworkers generally made racist comments multiple times lacked the specificity necessary to show frequency); *Farrukh v. Univ. of South Fla. Bd. of Trustees,* No. 21-13345, 2022 WL 3973703 (11th Cir. Sept. 1, 2022) (broad allegations that the plaintiff complained about and "exposed" discriminatory practices insufficient).

Finally, Plaintiffs allege B.T. experienced "several incidents where white students screamed the term 'n*****' at black children walking down the hallway,"

---

only proper but required." *Brinkley*, 2:18-CV-89, 2021 WL 1233352, at *5 (citing *Morris v. Ross*, 663 F.2d 1032, 1033-34 (11th Cir. 1981); Fed. R. Civ. P. 56(e)).

[6] B.T. testified that she did not report any discrimination or racial events to the Principal, Judson Cox. (B.T. Dep. [Dkt. 51-7] 34:3-5.) She had no contact with the former Principal Turrentine (id. at 56:15-17), and she did not report any discrimination or racism to McGhee (id. at 57:12-14).

but there is no evidence that any of these alleged incidents were directed toward B.T. *See Yelling*, 82 F.4th at 1336 ("[O]verhearing offensive comments is less severe or humiliating than being the intended target of direct harassment."). Nor is there any evidence that they were reported to any administrator.

This evidence is insufficient to create a genuine issue of material fact regarding whether B.T. experienced an objectively hostile environment or that the School District's response to acts of *known* harassment "clearly unreasonable in light of the known circumstances." *Hill*, 797 F.3d at 973 (quoting *Davis*, 526 U.S. at 648).

### 3.    J.T.M.

Plaintiffs identified the following alleged instances of racism J.T.M. experienced during her five years at Coosa: 1) she was present during the incident with the student wearing a Confederate belt buckle; and 2) multiple white students called J.T.M. "n*****" and pulled at her natural hair. (Pls.' Mem. [Dkt. 70-1] at 8.)

There is no evidence that any racial comments were directed toward J.T.M. during the belt buckle incident. J.T.M. testified that *one* student pulled her hair and called her "n*****" (J.T.M. Dep. [Dkt. 51-3] at 17:13-18:2), but there is no evidence that this incident was reported to any administrator. J.T.M. testified that one other student asked her if it was okay for him to say the N word, and he said the word to two other students, but not to J.T.M. (*Id*. at 18:19-20:12.) There is no evidence that this incident was reported to any administrator, either.

These three isolated instances over the course of a five-year period do not create a genuine issue of fact regarding whether J.T.M. experienced an objectively hostile environment. *See Yelling*, 82 F.4th at 1336 (racist comments were only isolated epithets rather than extreme harassment where multiple coworkers and a supervisor uttered them in the plaintiff's presence). J.T.M. testified that she was never disciplined for wearing Black Lives Matter or George Floyd clothing (J.T.M. Dep. [Dkt. 51-3] at 70:23-71:1); she did not see any Confederate flags on campus in person (*id*. at 71:2-4); she did not see any Confederate flag apparel except the belt buckle on the boy on the bus ramp (*id*. at 71:8-10); she never heard students yelling the n-word in the hallways (*id*. at 71:11-13); and she did not witness other students receiving racial slurs or discrimination (*id*. at 73:15-18).

### 4. J.R.M.

Plaintiffs identified the following alleged instances of racism experienced by J.R.M. over a period of four years at Coosa: 1) she was "called 'n*****', a 'nappy haired niglet', and a nappy head, 'n***** monkey'"; 2) "a white male student told J.R.M. he was going to 'take her back to the slave days' and 'do you how your ancestors [were done],'; and 3) a "white student made the comment to J.R.M. that 'all black girls got big asses.'" (Pls.' Mem. [Dkt. 70-1] at 8-9.)

Regarding the name-calling, J.R.M. testified that in middle school, one student called her the N-word between four and six times and was disciplined for it

through an in-school-suspension. (J.R.M. Dep. [Dkt. 51-2] at 33:18-36:9.) She testified that in ninth grade, a student called her the N word, and Assistant Principal Kristen Martin responded by saying no one should say the N-word and sitting in on the class the following day. (*Id.* at 45:23-47:6.) These responses by the school are not "clearly unreasonable in light of the known circumstances.'" *See Hill*, 797 F.3d at 973 (quoting *Davis*, 526 U.S. at 648). The school responded to the first student by giving him an in-school-suspension and responded to the second incident by observing the class. "[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators," *see Davis*, 526 U.S. at 648, and schools retain "'flexibility' to make whatever 'disciplinary decisions' [they] consider[] appropriate" as long as those decisions are not clearly unreasonable. *A.P. v. Fayette Cnty. Sch. Dist.*, No. 21-12562, 2023 WL 4174070, at *9 (11th Cir. June 26, 2023).

Regarding the two other instances of racism Plaintiffs allege J.R.M. experienced, the only evidence of the alleged comments is inadmissible hearsay by J.R.M.'s mother, Jessica Murray. Further, there is no evidence that these comments were reported to any administrator. Even if Plaintiffs presented admissible evidence of these comments, they are isolated incidents that do not rise to the level of severe, pervasive harassment sufficient under Title VI and the equal protection clause.

### 5. M.T.

Plaintiffs claim M.T. experienced the following incidents of racism: 1) a white

student taunted her by holding a Confederate flag over her head while calling her a "n*****"; 2) she heard slurs like "n****" and "porch monkey" "50 to a [100] times" in two years; 3) she encountered a white student brandishing what she called a whip and stating to her, "Do you know what this is? . . . It's what we used to whip you all with"; 4) a white student with a Confederate belt buckle told her, "You all are slaves...that's what you used to be called."; and 5) she was called a "nappy headed niglet" and a "n****" on an almost daily basis. (Pls.' Mem. [Dkt. 70-1] at 7-8.)

M.T.'s testimony is not enough to meet the rigorous standard for asserting a student-on-student harassment claim against the School District. As the Eleventh Circuit explained in *Adams v. Demopolis City Schools*, 80 F.4th 1259, 1264 (11th Cir. 2023), "the standard for relief in cases of student-on-student harassment is exacting." There, nine-year-old McKenzie Adams was bullied by multiple students because of her race and gender—including name-calling (black bitch, dumb black bitch, n*****, black motherfucker) and physical harm—hair-pulling, hitting, and slapping. The bullying was reported to school officials, but it persisted regardless until ultimately McKenzie tragically took her own life.

Despite the egregious bullying McKenzie experienced, her family failed to present sufficient evidence to show that the defendants' conduct was rose to the level of deliberate indifference needed to show a Title VI claim or intentional discrimination needed to sustain an equal protection claim. *Adams*, 80 F.4th at 1269.

The plaintiffs would have had to show "a pervasive practice or custom of ignoring the bullying directed at McKenzie," which they failed to do. *Id.* at 1274. As a result, summary judgment for the defendants was proper.

M.T.'s testimony that she was repeatedly called derogatory names because of her race is disturbing and unacceptable. Aside from general, broad allegations of name-calling, M.T. only identifies three specific instances over a multi-year period: the Confederate flag over her head, the "whip" incident, and the belt buckle incident. M.T. claims she reported the Confederate flag being held over her head to Martin, but she did not know the name of the student who did it. (M.T. Dep. [Dkt. 51-6] at 75:2-5.) There is no evidence that the response to this complaint was "clearly unreasonable" given that the student was not identified. M.T.'s reference to a student bringing a "whip" appears to be the same item that other Plaintiffs have referred to as a "noose", which Martin promptly investigated and determined was a cowboy lasso that the student, who had dressed as a cowboy for Spirit Week, brought with him. (K. Martin Aff. [Dkt. 49] ¶ 10.) Plaintiffs offer very different descriptions of the belt buckle incident. Deserae described the boy as apologetic that slavery ever happened and reassuring that he did not wear the Confederate flag symbol because of hatred. (D. Turner Dep. [Dkt. 51-5] at 134:6-12.) Even if M.T.'s account is to be believed, there is no evidence that the school was deliberately indifferent to known harassment surrounding the belt buckle incident.

Aside from these three isolated incidents, M.T.'s only evidence consists of her own broad testimony, which is nothing more "than a repetition of [her] conclusional allegations…." *See Brinkley*, 2:18-CV-89, 2021 WL 1233352, at *5 (citing *Morris v. Ross*, 663 F.2d 1032, 1033-34 (11th Cir. 1981)). This is not sufficient at the summary judgment stage. *See id.*

### D. Plaintiffs abandoned their Title VI retaliation claim (Count V).

The School District has articulated a legitimate, nonretaliatory reason for suspending J.R.M. and J.T.M. and for issuing the trespass warning to Jessica Murray: their disruptive behavior in the school lobby on October 7. (Br. in Spt. of Mot. Summ J. [Dkt. 48-1] at 24-25.) Plaintiffs failed to respond to the School District's motion as to the Title VI retaliation claim and failed to present evidence that the School District's legitimate actions were pretextual. (*See* Pls.' Br. [Dkt. 70-1], addressing the First Amendment retaliation claim, but not the Title VI retaliation claim.) By not responding, Plaintiffs abandoned this claim. *See Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (claims not addressed in response to motion for summary judgment are deemed abandoned); *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 971 n. 36, *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (claim not defended on summary judgment is abandoned). Therefore, the School District is entitled to summary judgment on Plaintiffs' Title VI retaliation claim (Count V).

Respectfully submitted this 19th day of February, 2024.

**HALL BOOTH SMITH, P.C.**

*/s/ Richard N. Sheinis*
_____
RICHARD N. SHEINIS
GA State Bar No. 639865
11215 N. Community House Rd., Suite 750
Charlotte, NC  28277
T:  980-859-0380
E:  rsheinis@hallboothsmith.com
***Attorneys for Defendant***

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel certifies the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in local rule 5.1(C) and 7.1(D).

Respectfully submitted this 19th day of February, 2024.

**HALL BOOTH SMITH, P.C.**

*/s/ Richard N. Sheinis*

_____
RICHARD N. SHEINIS
GA State Bar No. 639865
11215 North Community House Rd.
Suite 750
Charlotte, NC  28277
T:  980-859-0380
E:  rsheinis@hallboothsmith.com
***Attorneys for Defendant***

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on February 19, 20024, **Defendant Floyd County School District's Reply in Support of its Motion for Summary Judgment** was served electronically upon the lead counsel of record for **Plaintiffs,** listed below:

Artur Davis
HKM Employment Attorneys, LP
2024 3rd Avenue, North Suite 307
Birmingham, AL  35203
T:  205-881-0935
*(admitted pro hac vice)*
E:  adavis@hkm.com
*Attorneys for Plaintiffs*

Harry M. Daniels
The Law Offices of Harry Daniels
233 Peachtree St., NE, Suite 1200
Atlanta, GA 30303
T:  404-620-6110
E:  daniels@harrymdaniels.com
*Attorneys for Plaintiffs*

Shannon Liss-Riordan
Anastasia Doherty
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
T: 617-995-5800
*(admitted pro hac vice)*
E: sliss@llrlaw.ocm
   adoherty@llrlaw.com
*Attorneys for Plaintiffs*

*By: /s/Richard Sheinis*
Richard Sheinis
GA State Bar No. 639865
**Hall Booth Smith PC**
11215 North Community House Road
Suite 750
Charlotte NC 28277
T:  980-859-0380
rsheinis@hallboothsmith.com
*Lead Counsel for Defendant*