IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| DESERAE TURNER et al., | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 4:22-cv-00113-LMM |
| FLOYD COUNTY SCHOOL | : | |
| DISTRICT, | : | |
| | : | |
| | : | |
| Defendant. | : | |

## **ORDER**

This case comes before the Court on Defendant Floyd County School

District's Motion for Summary Judgment [48]. After due consideration, the Court

enters the following Order.

## I.  **BACKGROUND**

This is a civil rights case about racism and free speech at Coosa High

School ("CHS"), a school in Defendant's district. Plaintiffs are five Black students[1]

who allege that they faced severe racial harassment at CHS. Plaintiff Jessica

Murray, mother of Plaintiffs J.T.M. and J.R.M., joins the student Plaintiffs with

her own Title VI retaliation claim.

---

[1] Plaintiffs M.T., B.T., J.T.M., and J.R.M. are minors bringing claims by and
through their mothers. Plaintiff Deserae Turner brings her claims individually.

The student Plaintiffs all started at CHS between 2019–2021. The record shows multiple incidents of serious racism at CHS. For example, a white student told Plaintiffs M.T., J.T.M., and B.T. that they were "slaves" and "n******."[2] Dkt. No. [70-11] ¶ 47. A white student called Plaintiff Deserae Turner a "monkey" while she was eating a banana at lunch, and students made fun of Deserae's hairstyle, comparing her braids to worms and snakes and calling her Medusa. Id. ¶¶ 24–25. Students also often wore Confederate paraphernalia, and CHS's Assistant Principal, Ms. Martin, told Plaintiff M.T. that the Confederate flag "wasn't hate towards anyone and it didn't make students feel uncomfortable. It was for heritage." Id. ¶¶ 48–49. However, when Plaintiffs wore George Floyd and Black Lives Matter attire, they were required to change or face discipline.[3] Id. ¶¶ 89, 93. There were also multiple incidents of CHS students circulating racist social media posts. Id. ¶¶ 9, 28, 55; Dkt. No. [52] ¶¶ 9, 22. When Plaintiffs reported racist incidents to school officials, some students were disciplined while others were not.

In fall of 2021, a group of students organized an anti-racism protest at CHS. The day before the protest, CHS's Principal, Mr. Cox, announced that the protest was not allowed and called for students to bring flyers about the protest to

---

[2] The Court replaces the full slur with "n*****" in this Order. In doing so, the Court does not mean to diminish its impact.

[3] Defendant objects that the evidence does not support this fact. Dkt. No. [77] ¶¶ 89, 93. The Court disagrees. Plaintiffs point to deposition testimony that adequately supports this assertion.

his office. Dkt. No. [52] ¶ 34. Later that day, students convened at the principal's office and became loud and disruptive.[4] Id. ¶ 36; Dkt. No. [70-11] ¶ 79. Six Black students, including Plaintiffs J.R.M., M.T., B.T., and Deserae Turner, were suspended after the disturbance. Dkt. No. [52] ¶ 42. Plaintiff Jessica Murray came to the school lobby during the incident and received a trespass notice. Id. ¶¶ 43–44. The next day, students held their protest across the street from CHS, and six more students were suspended. Id. ¶¶ 45, 47.

Based on these facts, Plaintiffs allege five counts against Defendant: (1) a § 1983 Fourteenth Amendment Equal Protection Clause claim regarding student-on-student harassment and discriminatory enforcement of disciplinary policies, (2) a § 1983 First Amendment claim for infringement of free speech relating to the school dress code and social media policy, (3) a § 1983 First Amendment retaliation claim for four Plaintiffs' suspensions, (4) a Title VI (42 U.S.C. § 2000d) race discrimination claim regarding student-on-student harassment, and (5) a Title VI retaliation claim. Dkt. No. [24]. Defendant moves for summary judgment, contending that Plaintiffs have failed to meet their burden on all counts. Dkt. No. [48-1].

---

[4] The parties disagree about how many students were loud, but they agree that there was a disturbance in the lobby while Plaintiffs were present. Dkt. No. [70-10] ¶ 36; Dkt. No. [77] ¶ 79.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party discharges its burden by merely "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). If the record as a whole could not lead a rational trier of fact to find for the nonmoving party, then there is no genuine dispute for trial. Id. (citations omitted). All reasonable doubts, however, are resolved in favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993) (citation omitted).

## III.   DISCUSSION

Defendant moves for summary judgment on all counts. There are five sets of claims for the Court to address: (1) Plaintiffs' equal protection and Title VI claims regarding student-on-student harassment, (2) Plaintiffs' equal protection claim relating to their suspensions, (3) Plaintiffs' First Amendment retaliation claim relating to their suspensions, (4) Plaintiffs' First Amendment claim regarding dress code enforcement, and (5) Plaintiffs' Title VI retaliation claim. The Court finds that Plaintiffs have failed to meet their burden on their equal protection and Title VI claims but finds that there is a genuine issue of material fact on Plaintiffs' First Amendment claims. The Court considers these issues in turn.

### A. Equal Protection & Title VI: Student-on-Student Harassment

First, Plaintiffs bring an equal protection claim and a Title VI discrimination claim alleging student-on-student racial harassment. Plaintiffs

point to several incidents of racist harassment and bullying that they suffered at CHS, including racist social media posts, frequent use of racial slurs, students wearing Confederate flag attire, and racist verbal attacks and name-calling. Despite these facts, Defendant contends that Plaintiffs have failed to show that Defendant was deliberately indifferent to the harassment, as is required to satisfy the element of intentional discrimination for both claims. Dkt. No. [48-1] at 12–14. The Court agrees with Defendant.[5]

Plaintiffs' equal protection and Title VI claims are interrelated. The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Title VI states, "[n]o person . . . shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "Title VI provides no more protection than the Equal Protection Clause does." Adams v. Demopolis City Schs., 80 F.4th 1259, 1272 (11th Cir. 2023).

Both laws require a plaintiff to prove discriminatory intent. Because Defendant is the school district, Plaintiffs must also show that the discrimination resulted from a custom or policy of the district and that the discriminatory

---

[5] The Court need not consider the other elements of Plaintiffs' equal protection and Title VI discrimination claims, or the standards for Monell liability in this context, because the lack of discriminatory intent is fatal to both claims.

practice was so widespread that the district had notice of the need to act on it. Id. at 1273. In Adams v. Demopolis City Schools, the Eleventh Circuit held that "a school district engages in intentional discrimination and is liable under Title VI when it is deliberately indifferent to known acts of student-on-student racial harassment." Id. Similarly, for an equal protection claim, intentional discrimination means a "pervasive practice or custom" of ignoring the harassment. Id. at 1274. Therefore, for equal protection purposes, there is no intentional discrimination without deliberate indifference. Id.

Deliberate indifference presents a signifcant bar for Plaintiffs to clear. "A school is deliberately indifferent only where its response, or lack thereof, to student-on-student harassment or discrimination is 'clearly unreasonable' in the light of known circumstances." Id. at 1270 (quoting Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 648 (1999)). Ineffective measures alone are not sufficient to show deliberate indifference; instead, the response to the harassment "must amount to 'an official decision not to remedy the violation.'" Id. (alteration adopted) (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998)).

Plaintiffs argue that they have established deliberate indifference for three reasons: (1) CHS officials failed to adequately respond to reports of harassment, (2) CHS should have made a more concerted effort to combat the harassment as a whole, and (3) CHS had a pattern of biased discipline against Black students. The Court considers these arguments in turn.

First, Plaintiffs claim that CHS officials failed to adequately address reports of racial harassment. But as Defendant notes, each time a specific instance of harassment was reported to teachers or other officials, there was a school response. For example, when former Principal Turrentine was told that a student had created a racist social media video on campus, she and the school resource officer met with the student and his parents the next day. Dkt. No. [52] ¶¶ 18–19. The same student was then suspended two weeks later. Dkt. No. [70-10] ¶ 20. When Assistant Principal Martin was told of another racist social media post, she investigated the incident and determined that the post was created before the student attended CHS. Dkt. No. [52] ¶¶ 22–23. And when Plaintiff J.R.M. reported that a student called her "n*****," Assistant Principal Martin denounced that behavior and sat in on class the next day. Dkt. No. [51-2] at 45–47. Although these responses did not successfully stem the racial abuse at CHS, they were not clearly unreasonable under the circumstances, nor do they amount to an official decision not to remedy the harassment that Plaintiffs faced. Adams, 80 F.4th at 1270.

Next, Plaintiffs broadly assert that school officials failed to respond to regular reports of harassment. E.g., Dkt. No. [70-11] ¶¶ 36, 51; Dkt. No. [70-1] at 17. These general allegations are also insufficient to show deliberate indifference. In some instances, Plaintiffs reported harassment but did not know the students' names. In others, Plaintiffs did not know how school officials handled their reports. Given the undisputed facts about the school's response to specific

8

instances of harassment, Plaintiffs' general testimony about harassment by unnamed students and broad statements about reporting abuse are not enough to show that the school district's conduct rises to the level of deliberate indifference.

Plaintiffs also argue that school officials knew of pervasive racist harassment but "failed to take meaningful steps to deter the bullying and verbal abuse." Dkt. No. [70-1] at 12–13. For example, Plaintiffs contend that school officials failed to adequately discipline a student for posting a racist video because they merely directed him not to engage in similar conduct during the upcoming school year. Id. at 13. Plaintiffs also argue that the prevalence of Confederate flag images at CHS shows that the school's efforts to stop harassment were "inconsequential." Id. at 14. But as the Eleventh Circuit explained in Adams, "the deliberate indifference standard does not turn on effectiveness." 80 F.4th at 1271. Thus, even if the school's response proved inadequate and more effective measures could have been taken, its response did not amount to deliberate indifference by the district.

Plaintiffs argue that the Eleventh Circuit's opinion in Doe v. School Board of Broward County, 604 F.3d 1248, 1261 (11th Cir. 2010), required Defendant to take more effective measures.[6] There, the Eleventh Circuit determined that "where a school district has knowledge that its remedial action is inadequate and

---

[6] Throughout their deliberate indifference argument, Plaintiffs rely on non-binding case law from other circuits. Dkt. No. [70-1] at 13–18. The Court is bound by the law of the Eleventh Circuit, so it does not address those cases.

ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior." <u>Doe</u>, 604 F.3d at 1261 (quoting <u>Vance v. Spencer Cnty. Pub. Sch. Dist.</u>, 231 F.3d 253, 261 (6th Cir. 2000)). Based on this standard, Plaintiffs argue that Defendant's "half-hearted" efforts do not suffice because they failed to implement successively more aggressive measures to eradicate racist harassment at CHS. Dkt. No. [70-1] at 14–15. In <u>Doe</u>, the principal had actual notice of complaints of one teacher sexually harassing multiple students and failed "to institute *any* corrective measures." <u>Doe</u>, 604 F.3d at 1261 (emphasis added). Here, however, different students were involved in each incident and were disciplined individually, depending on their conduct. Plaintiffs assert that this was a "piecemeal and sporadic" response, Dkt. No. [70-1] at 17, but CHS officials addressing the specific, isolated incidents reported to them separates this case from <u>Doe</u> and undermines Plaintiffs' deliberate indifference argument. While school officials could have done more to address racism at CHS, their reaction to each reported incident was not clearly unreasonable in light of the individual circumstances.

Plaintiffs contend that the school had a pattern of disciplining Black students, including Plaintiffs, while failing to discipline white students for similar, and worse, behavior. <u>Id.</u> at 15–16. Plaintiffs contrast the school's reaction to the planned anti-racism protest with its reaction to the harassment and bullying towards Plaintiffs—i.e., Plaintiffs argue that CHS punished Black students for planning and participating in an anti-racism protest, while it failed

to punish white students for harassing Plaintiffs. Id. However, addressing an organized and well-advertised protest differently from an individual student's racist conduct is not clearly unreasonable because the two situations are fundamentally different.

Plaintiffs also argue that when a group of white students heckled Plaintiffs with racial slurs in the presence of school officials, they were not disciplined, but Plaintiff M.T. was threatened with discipline for reposting a white student's racist social media post, revealing a disparity in discipline based on race.[7] Id. at 16. While these disciplinary decisions may reflect poor judgment by CHS officials, they do not show that Defendant was deliberately indifferent to student-on-student racial harassment at CHS. One instance of harassment in which students were not disciplined does not show an official decision not to remedy harassment. More importantly, these facts do not show that Defendant had a custom of ignoring student-on-student discrimination at the *district* level, especially because all of the events occurred at CHS. Plaintiffs have not provided any evidence of similar issues at other schools in Defendant's jurisdiction. See Adams, 80 F.4th at 1270 ("To act with deliberate indifference, a school district or official 'must know of and disregard an excessive—that is, an extremely great—

---

[7] Defendant objects that the evidence does not support the fact that Plaintiff M.T. was threatened with expulsion for putting a white student in danger by reposting his racist video, Dkt. No. [77] ¶ 50, but M.T.'s deposition testimony clearly supports this assertion, Dkt. No. [70-6] at 24.

risk to the victim's health or safety.'" (quoting <u>L.S. ex rel. Hernandez v. Peterson</u>, 982 F.3d 1323, 1330 (11th Cir. 2020))).

In sum, Plaintiffs' allegations show that they have faced persistent, horrific harassment at school, and the Court does not diminish the severity of Plaintiffs' claims. Nonetheless, the deliberate indifference standard is exacting, and holding a school district liable for student-on-student harassment requires a "pervasive practice or custom of ignoring the bullying" against Plaintiffs. <u>Id.</u> at 1274. The record does not show that Defendant had such a custom here because CHS officials responded to Plaintiffs' specific reports of racist harassment and disciplined individual students for their conduct. Therefore, Plaintiffs have failed to show the intentional discrimination required for their equal protection and Title VI claims. The Court **GRANTS** Defendant's Motion for Summary Judgment on Plaintiffs' equal protection (Count One) and Title VI claims (Count Four) related to student-on-student harassment.

### B. Equal Protection: Suspensions

Next, Plaintiffs J.R.M., M.T., B.T., and Deserae Turner assert an equal protection claim for their suspensions. Plaintiffs were suspended after the disturbance in the CHS lobby, the day before the planned antiracism protest. Plaintiffs claim that they were suspended at least in part because of their race. Dkt. No. [70-1] at 18–20. Defendant moves for summary judgment on this claim, arguing that Plaintiffs were suspended for failure to return to their classrooms

after being instructed to do so, not because of their race.[8] Dkt. No. [48-1] at 14–16. The Court finds that Plaintiffs have failed to show a genuine issue of material fact on this claim.

Put simply, the Equal Protection Clause mandates that all similarly situated persons be treated alike. Carr v. Bd. of Regents of Univ. Sys. of Ga., 249 F. App'x 146, 149 (11th Cir. 2007) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982)). To establish an Equal Protection Clause violation, Plaintiffs must show discriminatory intent, meaning evidence that they were treated differently because of their race. Id. Specifically, because Plaintiffs allege selective enforcement of CHS disciplinary policies, Plaintiffs must show (1) that they were treated differently from similarly situated individuals, and (2) that Defendant "unequally applied" school policies "for the purpose of" discriminating against Plaintiffs. Roy v. Fulton Cnty. Sch. Dist., 288 F. App'x 686, 688 (11th Cir. 2008) (per curiam) (quoting GJR Invs., Inc. v. Cnty. of Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998)). "To be similarly situated, the comparators must be prima facie identical in all relevant aspects." Grider v. City of Auburn, 618 F.3d 1240, 1264 (11th Cir.2010) (cleaned up).

Plaintiffs assert that they were suspended because of their race, while similarly situated individuals outside of Plaintiffs' protected class were treated

---

[8] Defendant also argues that Plaintiffs cannot satisfy the standards for Monell liability on this claim. Dkt. No. [48-1] at 8–11. Because the Court finds that the claim fails on its merits, the Court does not address the related Monell issues.

more favorably. Plaintiffs point to two sets of comparator evidence. First, Plaintiffs argue that a student who is not Black admitted to Plaintiffs Deserae, M.T., and B.T.'s mother that she was loud during the disturbance in the school lobby but was not suspended. Dkt. No. [70-1] at 19. This claim does not show that Defendant discriminated against the suspended Plaintiffs because there is no indication that school officials were aware of that student's behavior and chose not to suspend her. Additionally, Defendant contends that Plaintiffs were suspended for failing to return to class, not solely for being disruptive. Dkt. No. [48-1] at 15. Second, Plaintiffs point to an incident in which a group of white students loudly heckled Plaintiffs with racial slurs in view of school officials and did not face any discipline. Dkt. No. [70-1] at 19. That incident is distinct from the disturbance outside the principal's office because it occurred after school hours when Plaintiffs were waiting to be picked up—not in the lobby during class time.

Therefore, these comparators are not "identical in all relevant aspects," as is required for a successful equal protection claim. Grider, 618 F.3d at 1264; Carr, 249 F. App'x at 149 (finding that comparators were not sufficient to show an equal protection violation because their "punishments were mitigated because of the individual circumstances of those students rather than their race"). Instead, these comparisons show that CHS officials made different disciplinary decisions for different students, depending on their individual contexts. While it is concerning that the students using racial slurs were not disciplined, there is no evidence in the record to show that the decision to suspend Plaintiffs was

14

motivated by race. Plaintiffs engaged in different behavior from the students who were not disciplined, leaving Plaintiffs without an accurate comparator. See Carr, 249 F. App'x at 149.

Alternatively, Plaintiffs rely on a mixed motive theory, which only requires proof that race was a motivating factor in the decision. See Quigg v. Thomas Cnty. Sch. Dist., 814 F.3d 1227, 1235 (11th Cir. 2016). Plaintiffs have failed to provide any evidence that race was a motivating factor in Principal Cox's decision to suspend Plaintiffs. There is no direct evidence that Principal Cox was motivated to suspend Plaintiffs because of their race—e.g., there are no statements from Principal Cox or other school officials indicating that race was a factor in the decision. Cf. id. at 1241–42. As for circumstantial evidence, Plaintiffs turn back towards a comparative approach. They rely on the fact that six Black students were suspended, and they claim that white students engaging in comparable conduct were not.[9] Dkt. No. [70-1] at 20. But Plaintiffs agree that five white students and one Hispanic student were suspended on the day of the protest. Dkt. No. [52] ¶ 47; Dkt. No. [70-10] ¶ 47. Additionally, Plaintiff J.T.M., a Black student, attended the protest and was not suspended. Dkt. No. [52] ¶ 48. Thus,

---

[9] Plaintiffs also contend that there is a genuine issue of material fact regarding the rationale for Plaintiffs' suspensions because Superintendent White testified that only one student was yelling and cursing, and Plaintiff Deserae Turner testified that she did not raise her voice. Dkt. No. [70-1] at 19. Even accepting these facts as true, they do not show that Plaintiffs were treated differently because of their race; they are relevant, however, to Plaintiffs' First Amendment retaliation claim, as discussed below.

Plaintiffs have failed to provide any evidence to show that their race motivated Principal Cox's decision to suspend them.

Therefore, Plaintiffs have failed to show a genuine issue of material fact on this issue. Defendant's Motion for Summary Judgment is **GRANTED** as to Count One's equal protection allegations about inconsistent enforcement of disciplinary policies.

### C. First Amendment: Protest

Next, the four suspended Plaintiffs assert a First Amendment retaliation claim. Plaintiffs contend that they engaged in constitutionally protected speech by planning in the anti-racism protest and that Defendant retaliated by suspending them. Dkt. No. [70-1] at 23–24. Defendant moves for summary judgment on this claim, arguing that the students were suspended for disruptive behavior and for refusing to return to class when instructed to do so, not for planning the protest. Dkt. No. [48-1] at 18–19. The Court finds that there is a genuine issue of material fact on this claim.

At the outset, Plaintiffs must satisfy the requirements for Monell liability for this § 1983 claim. Defendant contends that the district does not have a pervasive custom or practice of curtailing free speech, so it is not subject to liability. Id. at 19. In response, Plaintiffs argue that Defendant has an unconstitutional policy of prohibiting all student protests. Dkt. No. [70-1] at 23 n.10. Superintendent White testified that "[a]ny protest during the school day would violate school policy," and Principal Cox told students that protests at

school were not allowed. Dkt. No. [69-1] at 162; Dkt. No. [70-11] ¶ 76. Defendant does not contest this argument in its Reply. Therefore, Plaintiffs have satisfied the Monell requirements for this claim. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978) (permitting municipal liability for "execution of a government's policy or custom" that "represent[s] official policy").

Turning to the merits, a First Amendment retaliation claim has three elements: (1) Plaintiffs engaged in constitutionally protected speech; (2) Defendant's retaliatory conduct adversely affected the protected speech; and (3) there is a causal connection between the retaliatory conduct and the adverse effect on speech. See Zen Grp., Inc. v. Agency for Health Care Admin., 80 F.4th 1319, 1329 (11th Cir. 2023) (quoting DeMartini v. Town of Gulf Stream, 942 F.3d 1277, 1289 (11th Cir 2019)). Plaintiffs assert that the planned protest was protected speech and that their suspension was an adverse action. Dkt. No. [70-1] at 23–24. To satisfy the "causal link" prong, Plaintiffs must show that their speech was a but-for cause of their suspensions. See DeMartini, 942 F.3d at 1289–90; Nieves v. Bartlett, 587 U.S. 391, 398–99 (2019).

Defendant asserts that the disturbance in the lobby and the protest itself disrupted classwork, but Defendant does not challenge Plaintiffs' assertions that they engaged in protected speech by planning the protest or that their suspensions were adverse actions. Dkt. No. [48-1] at 18–19. Therefore, the Court assumes without deciding that Plaintiffs have satisfied the first two elements at this stage and turns to the parties' disputes about the causation prong.

Defendant argues that Plaintiffs cannot satisfy the causation element because there is no evidence that Plaintiffs were disciplined for planning or attending the protest; Plaintiffs were suspended for causing a disruption and refusing to return to class when instructed to do so. Id. at 18; Dkt. No. [78] at 7–8. Plaintiffs dispute these facts and assert that they were suspended for organizing and engaging in the anti-racism protest. First, Plaintiffs argue that there is no evidence that all four Plaintiffs were being disruptive in the lobby. Dkt. No. [70-1] at 24. Deserae Turner testified that she did not raise her voice, and Superintendent White testified that he could only confirm that one student was yelling and using profanity during the incident. Dkt. No. [77-7] at 18; Dkt. No. [69-1] at 171–75.

Plaintiffs also point to additional evidence to support their argument that they were punished for planning the protest. Before the disruption in the lobby, Principal Cox made an announcement threatening discipline for students involved in the protest. Dkt. No. [70-11] ¶ 76. Principal Cox stated,

> The administration is aware of tomorrow's planned protest. Activities of this kind will not be allowed at Coosa High School. . . . Extra staff and police will be present here at school. If students insist on participating in these types of activities, they will be disciplined [in] accordance . . . for encouraging unrest in the school environment.

Id. Principal Cox also announced that possession of flyers or other publicity materials for the protest would "be considered a discipline issue." Id. The same morning, Assistant Principal Martin and a school resource officer escorted Plaintiff Deserae Turner from her class and told her that they were aware that she

was planning a protest and that she could "go to jail" for protesting at school.[10]
Dkt. No. [77-7] at 15; Dkt. No. [70-10] ¶ 74. These facts indicate that Plaintiffs'
engagement with the protest may have been a but-for cause of their suspensions.
Put another way, the Court cannot say as a matter of law that Plaintiffs would
have been suspended if they had not been involved with the protest because the
evidence shows significant hostility towards Plaintiffs' protected speech.

Therefore, Plaintiffs have shown that there is a genuine issue of material
fact regarding whether their suspensions were retaliatory. Taking the facts in the
light most favorable to Plaintiffs, a reasonable juror could determine that
Plaintiffs were suspended for engaging with the protest, not for refusing to return
to class or being disruptive. Accordingly, Defendant's Motion for Summary
Judgment is **DENIED** as to Plaintiffs' First Amendment retaliation claim in
Count Three.

### D. First Amendment: Dress Code

Next, Plaintiffs contend that Defendant violated the First Amendment by
enforcing its dress code inconsistently. The dress code prohibits distracting,
inflammatory, offensive, and dangerous clothing and accessories. Dkt. No. [48-1]
at 17. Plaintiffs assert that Defendant enforces the dress code in a biased manner
by permitting students to wear Confederate flag merchandise but requiring two

---

[10] Defendant objects that this fact is not material. Dkt. No. [77] ¶ 74. The
objection is overruled. This testimony is material to the reasons for Plaintiffs'
suspensions.

Plaintiffs to remove t-shirts with Black Lives Matter and George Floyd images. Dkt. No. [70-1] at 22. Defendant moves for summary judgment on this claim, arguing that Plaintiffs lack sufficient evidence of discrimination. Dkt. No. [48-1] at 17. The Court disagrees with Defendant.

The parties agree that the dress code is facially neutral; they argue only about enforcement. Plaintiffs contend that Defendant's biased enforcement constitutes viewpoint discrimination. Viewpoint discrimination is "an egregious form of content discrimination" that occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject." Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1126 (11th Cir. 2022) (quoting Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829 (1995)). Restrictions "'based on viewpoint are prohibited,' seemingly as a *per se* matter." Id. (quoting Minn. Voters. All. v. Mansky, 585 U.S. 1, 11 (2018)).

Defendant contends that Plaintiffs have not provided sufficient evidence that the dress code was enforced in a viewpoint discriminatory manner because Plaintiffs have only shown two instances in which they were required to change their clothing, which is not sufficient to create a widespread custom or policy that would subject Defendant to Monell liability. Dkt. No. [48-1] at 17. Plaintiffs respond that Monell liability is appropriate because school administrators are final policymakers for purposes of dress code enforcement. Dkt. No. [70-1] at 22 n.9. Defendant does not challenge that classification in its Reply. Dkt. No. [78] at 6–7.

Based on the record available, it appears that school officials do have final policymaking authority over dress code violations. To show final policymaking authority in the Monell context, the acting official's decisions must not be "subject to meaningful administrative review." Scala v. City of Winter Park, 116 F.3d 1396, 1401 (11th Cir. 1997); Denno v. Sch. Bd. of Volusia Cnty., 218 F.3d 1267, 1277 (11th Cir. 2000). Here, Plaintiffs contend that dress code interpretation is left to school administrators' discretion, based on Superintendent White's deposition testimony. Dkt. No. [70-1] at 22 n.9. Again, Defendant does not contest that assertion. Therefore, the Court finds that Plaintiffs have satisfied the requirements for Monell liability on this claim.

Next, Defendant asserts that Plaintiffs have failed to provide evidence that Principal Cox saw students wearing Confederate flags. Dkt. No. [78] at 6–7. In doing so, Defendant ignores Plaintiffs' claim that individual school administrators have final authority over the dress code, so Plaintiffs' allegations need not be limited to Principal Cox. Plaintiffs point to multiple instances in which teachers or officials were aware of students wearing Confederate flag attire and did not require those students to change.

For example, Defendant does not dispute Plaintiff M.T.'s testimony that she observed students wearing Confederate insignia almost daily. Dkt. No. [70-11] ¶ 48. It is also undisputed that M.T. reported a student carrying a Confederate flag to Assistant Principal Martin, and Martin responded that the "the flag wasn't hate towards anyone and it didn't make students feel uncomfortable. It was for

heritage." Id. ¶ 49. Additionally, Plaintiff B.T. testified that Assistant Principal Martin was in close enough proximity to hear a white student wearing a Confederate flag belt buckle tell four Plaintiffs that they used to be slaves.[11] Id. ¶ 56. Thus, Plaintiffs have provided sufficient evidence of CHS administrators choosing not to enforce the dress code against students with Confederate flag accessories while disciplining students for their Black Lives Matter attire.

Defendant also notes that Plaintiffs do not counter Principal Cox's testimony that the Confederate flag is not allowed in school, Dkt. No. [78] at 7, but that fact only provides further support for Plaintiffs' argument. Although Confederate flag attire was against the dress code, students were not disciplined for wearing it. By contrast, Plaintiffs were disciplined for wearing Black Lives Matter attire.

The prohibition on viewpoint discrimination is a bedrock First Amendment principle. See Reed v. Town of Gilbert, 576 U.S. 155, 156 (2015) (describing viewpoint discrimination as "blatant" and "egregious" (quoting Rosenberger, 515 U.S. at 829)). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." Rosenberger, 515 U.S. at

---

[11] Defendant objects to the admissibility of Plaintiffs' evidence to support this fact and argues that the evidence does not it support Plaintiffs' assertion. Dkt. No. [77] ¶ 56. Plaintiffs point to deposition testimony from Plaintiff B.T., in which she claimed that Assistant Principal Martin was "very close" to the students during the incident. Dkt. No. [51-7] at 28. It is unclear why this testimony would be inadmissible, and it supports the fact that Assistant Principal Martin was present for the incident, especially because Plaintiff B.T. went on to say that Martin tried to deescalate the situation. Id.

828. Given that stature, Plaintiffs have provided enough evidence to create a genuine issue of material fact on this claim. Taking the facts in the light most favorable to Plaintiffs, the record shows that school administrators (imbued with final policymaking authority for dress code purposes) did not enforce the dress code against students wearing Confederate flag attire but required Plaintiffs to change when they wore Black Lives Matter and George Floyd shirts. This discrepancy in enforcement clearly relates to the message of the students' attire. Therefore, it is enough for Plaintiffs' viewpoint discrimination claim at this stage. Defendant's Motion for Summary Judgment on Plaintiffs' First Amendment viewpoint discrimination claim regarding dress code enforcement in Count Two is **DENIED**.

In Count Two, Plaintiffs also allege inconsistent enforcement of CHS's social media policy. Defendant moves for summary judgment on this claim, Dkt. No. [48-1] at 17–18, and Plaintiffs do not respond to that argument. Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiffs' First Amendment claim regarding the social media policy in Count Two.

### E. Title VI: Retaliation

Finally, Plaintiffs J.T.M., J.R.M., and Jessica Murray assert Title VI retaliation claims. Defendant moves for summary judgment on this claim, Dkt. No. [48-1] at 24–25, and Plaintiffs do not address this issue in their Response to Defendant's Motion. Therefore, Defendant's Motion is deemed unopposed on these grounds, but the Court still must determine whether the Motion succeeds

on its merits. L.R. 7.1(B), N.D. Ga.; <u>Jackman v. Hasty</u>, No. 1:10-cv-2485-RWS, 2012 WL 1426769, at *2 (N.D. Ga. Apr. 24, 2012).

Title VI retaliation claims follow the same burden-shifting framework as Title VII claims. First, Plaintiffs must establish a prima facie case of retaliation, which has three elements: (1) Plaintiffs engaged in a statutorily protected activity; (2) they suffered an adverse action; and (3) there is a causal link between the protected activity and adverse action. <u>McCullough v. Bd. of Regents of the Univ. Sys. of Ga.</u>, 623 F. App'x 980, 982 (11th Cir. 2015). If Plaintiffs establish a prima facie case, the burden shifts to Defendant to articulate "legitimate, non-retaliatory reasons for its actions." <u>Cox v. Fulton Cnty. Sch. Dist.</u>, No. 1:19-cv-04520-JPB-RGV, 2022 WL 22308805, at *23 (N.D. Ga. Jan. 21, 2022) (citing <u>Berman v. Orkin Exterminating Co.</u>, 160 F.3d 697, 702 (11th Cir. 1998)). That burden is "exceedingly light." <u>Id.</u> (quoting <u>Tolar v. Bradley Arant Boult Commings, LLP</u>, 997 F.3d 1280, 1297 (11th Cir. 2021)). If Defendant meets that burden, the burden shifts back to Plaintiffs to show that the articulated reasons are mere pretext for retaliation. <u>Id.</u>

As to Plaintiff J.T.M., there are no facts in the record showing that she faced any retaliatory discipline.[12] Therefore, she has failed to state a *prima facie* case. As to Plaintiff J.R.M., Defendant asserts that she was suspended for her conduct in the lobby, not for her protected activity. Dkt. No. [48-1] at 25. And as

---

[12] Defendant incorrectly states that Plaintiff J.T.M. was suspended. Dkt. No. [48-1] at 25. She attended the protest and was not suspended.

to Plaintiff Jessica Murray, Defendant argues that she received a trespass warning for failure to leave the school lobby when asked to do so. Id. With these arguments, Defendant has satisfied its burden as to Plaintiffs J.R.M. and Jessica Murray. Because Plaintiffs have failed to respond, they have not carried their burden to show that those reasons are mere pretext. Thus, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Count Five.

## IV.   CONCLUSION

In accordance with the foregoing, Defendant's Motion for Summary Judgment [48] is **GRANTED in part** and **DENIED in part**. Defendant's Motion is **GRANTED** as to Counts One, Four, and Five in full, and to Count Two as it pertains to CHS's social media policy. Defendant's Motion is **DENIED** as to Count Three in full and as to Count Two's allegations about discriminatory enforcement of the dress code.

The parties are **DIRECTED** to **MEDIATE** this dispute. The parties are to confer and notify this Court within 7 days of the date of this Order whether they prefer a private mediator or a magistrate judge at no cost to either party. Within 2 days of the conclusion of the mediation, the parties are to notify the Court as to the outcome. The parties are further **DIRECTED** to confer and submit a pre-trial order within **30 days** of the conclusion of mediation, if unsuccessful.

**IT IS SO ORDERED** this 14th day of August, 2024.

**Leigh Martin May**
**United States District Judge**